UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MARVA Y. GLENN,

    and

WANDA Y. DICKENS,

    Plaintiffs,

      v.

ANTHONY WILLIAMS,

    Defendant.

Civil Action No. 98-1278 (CKK)

**MEMORANDUM OPINION**
(February 21, 2006)

Plaintiffs, Marva Y. Glenn ("Glenn") and Wanda Y. Dickens ("Dickens") (collectively

"Plaintiffs"), former employees of the District of Columbia Department of Consumer and

Regulatory Affairs ("the Department"), appear before this Court alleging gender-based

discrimination and retaliatory harassment in violation of Title VII of the Civil Rights Act of 1964,

as amended, 42 U.S.C. § 2000e *et seq*., and breach of contract by their employer, Anthony

Williams, the Mayor of the District of Columbia and head of the District of Columbia government

("Defendant").[1]  Specifically, Plaintiffs allege Defendant (1) breached contracts with Plaintiffs; (2)

---

[1] In his Reply, Defendant raises for the first time the argument that Plaintiffs' Title VII
claims must fail as a matter of law because Plaintiffs named only Mayor Anthony Williams, and not
the District of Columbia, as defendant.  Def.'s Reply ("Reply") at 1 n.1.  Defendant argues that
Title VII only allows suit against the employer, in this case the District of Columbia, and as such
Mayor Williams is not an appropriate party in interest.  *Id.*  Plaintiffs filed an uncontested motion for
leave to file a surreply in order to address this previously unraised argument on November 21, 2003,
Dkt. #153, which this Court granted on November 25, 2003.  *See Glenn v. Williams*, Civ. No. 98-
1278 (11/25/03 Minute Order Granting Leave to File Surreply).  In their Surreply, Plaintiffs made
two arguments in response to Defendant.  First, Plaintiffs argued that they properly named Mayor
Williams as defendant in the suit because Title VII permits suits against an employer or any agent of

discriminated against Plaintiffs on the basis of sex by failing to promote Plaintiffs and treating them

disparately; (3) retaliated against Plaintiffs for engaging in protected Title VII activities; (4) created

a hostile workplace; and (5) constructively discharged Plaintiffs.  Currently before the Court is

Defendant's Motion for Summary Judgment, pursuant to Federal Rule of Civil Procedure 56, which

contends that (1) Plaintiffs' claims are untimely; (2) Plaintiffs cannot establish a *prima facie* case of

discrimination, retaliation, hostile workplace, or constructive discharge; (3) this Court lacks

jurisdiction over Glenn's breach of contract claim; and (4) Dickens's breach of contract claim is

barred by the statute of limitations.  After reviewing the parties pleadings, the attached exhibits, the

relevant case law, and the entire record herein, the Court shall grant Defendant's Motion for

Summary Judgment.

---

the employer, 42 U.S.C. § 2000e(b), and second, that this Court should construe Plaintiffs'
Complaint as a suit against the District and amend the lawsuit to formally add the District as a
defendant under Federal Rule of Civil Procedure 15(a).  Pls.' Surreply at 1–3.  Due to the strong
preference in this Circuit to resolve issues based on their merits, rather than on technicalities, and
based on the fact that this suit has been languishing for over seven years without a resolution, the
lawsuit will be amended to formally change the named defendant; however, it will not be amended
to make the District the defendant.

      42 U.S.C. § 2000e(b) defines "employer" and includes within that definition "any agent" of
the employer.  42 U.S.C. § 2000e(b).  The definition of employer, however, also specifically
excludes "any department or agency of the District of Columbia subject by statute to procedures of
the competitive service." *Id.*  This exemption is remedied by 42 U.S.C. § 2000e-16 which provides
for suit against "those *units* of the Government of the District of Columbia [in which employees]
hav[e] positions in the competitive service."  42 U.S.C. § 2000e-16(a).  Civil actions are to be filed
naming the "head of the department, agency, or *unit*, as appropriate" as the defendant. *Id.* at §
2000e-16(c).  As it appears, neither Mayor Williams nor the District are proper defendants.  For this
reason, under Federal Rule of Civil Procedure 15(a), this Court will grant Plaintiffs leave to amend
the action, however instead of adding the District as a named defendant, the lawsuit will be amended
to substitute Department Director Dr. Patrick J. Canavan as the defendant.  For the remainder of this
Memorandum Opinion, the term Defendant will be used in reference to Dr. Canavan.

# I: BACKGROUND

*A.      Marva Y. Glenn*

Glenn was initially hired by the Department in 1969 as a housing inspector aide, District

Service ("DS") Grade 4.  Second Am. Compl. ¶ 9; Pls' Opp'n to Def.'s Mot. for Summ. J. ("Pls'

Opp'n"), Ex. 3 (Aff. of Marva Glenn) ("Glenn Aff.") ¶ 4.[2]  In 1985, Glenn was promoted to

---

[2] The Court begins its discussion of the facts by noting that this Court strictly adheres to the text of Local Civil Rule 56.1 (identical to Local Civil Rule 7.1(h)).  The Court also cites directly to the record, where appropriate, to provide additional information not covered in either of the parties' statements.

Contrary to Local Civil Rule 56.1, Defendant – in addition to its Motion for Summary Judgment – has not provided "a statement of material facts as to which the moving party contends there is no genuine issue, which shall include references to the parts of the record relied on to support the statement."  LCvR 56.1.  Rather than setting out factual statements in corresponding numbered paragraphs and *supporting each statement through citations to the record*, as required by Local Civil Rule 56.1 and this Court's September 16, 2003 Order, Defendant's "Statement of Material Facts as to Which There is No Genuine Dispute" is utterly devoid of citations to the record.  While Defendant does cite to the record in the accompanying Motion for Summary Judgment, Defendant's "Statement" simply contains numbered assertions with no support.

The Court finds that Defendant's deviation from the mandate of the Local Civil Rule undermines the purpose of the Rule which is to assist the Court in quickly determining which facts are actually in dispute and which facts are without support.  *See Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner*, 101 F.3d 145, 153 (D.C. Cir. 1996) ("[R]epeatedly blending factual assertions with legal argument, the 'relevant facts' section does not satisfy the purposes of a [Rule 56.1] statement."); *Robertson v. American Airlines*, 239 F. Supp. 2d 5 (D.D.C. 2002) (striking defendant's motion for summary judgment for noncompliance with Local Rule 7 and 56.1 because the "statement of material facts not in genuine dispute" included no citations to the record and improperly mixed factual allegations with argument); *Gibson v. Office of the Architect of the Capitol*, Civ. No. 00-2424(CKK), 2002 WL 32713321, at *1 n.1 (D.D.C. Nov. 19, 2002) ("Plaintiff's Statement is almost completely unhelpful to the Court as its provisions rarely address the facts outlined in Defendant's Statement, instead describing in lengthy detail the 'contextual and structural background' surrounding Defendant's stated facts.  Such excess, unresponsive verbiage is a clear violation of both the letter and the spirit of Local Rule 56.1."); *see also Koken v. Auburn Mfg., Inc.*, Civ. No. 02-83B-C, 2004 WL 1877808, at *2 (D. Me. Aug. 24, 2004) (chastising plaintiff for responding to defendant's statement of material facts by failing to cite to the record and for using cross-references that in most cases referred to other additional statements in response to defendant's singular statement, stating "[p]resumably [plaintiff] found this technique expeditious.  I, however, did not."); *Leanard v. Inhabitants of the Town of Van Buren*, 182 F. Supp. 2d 115 (D. Me. 2002) (deeming defendants' facts admitted in part because "many of Plaintiff's statements do not actually controvert the Defendants' fact that they purport to address").

supervisory inspector, DS 9.[3]  Pls.' Opp'n Ex. 29 (6/17/86 Personnel Action for Glenn).  Glenn filed

a complaint with the Equal Employment Opportunity Commission ("EEOC") in 1989 alleging the

Department was discriminating against her on the basis of her sex when it assigned her work in a file

room, indefinitely, while another housing inspector was assigned to her unit.  Pls.' Opp'n at 3;

Second Am. Compl. ¶ 12; Glenn Aff. ¶ 14.  This complaint was resolved through an administrative

Settlement Agreement before the EEOC requiring the Department to refrain from discriminating or

retaliating against Glenn and to provide Glenn with training opportunities.  Second Am. Compl. ¶

12; Def.'s Mot. at 2, 40.

In 1990, Glenn was promoted to DS 10, but retained her job title as supervisory housing

inspector and was transferred within the Department from the Housing Inspection Division ("HID")

to the Housing Regulation and Enforcement Division.  Pls.' Opp'n, Ex. 21 (11/26/90 Personnel

Action for Glenn).  Glenn joined a class action law suit in 1991 filed against the Department

alleging sex discrimination and harassment.  Pls.' Opp'n at 3; Glenn Aff. ¶ 14.  Glenn was promoted

again in 1992 to supervisor, the first woman to achieve the post, and was awarded the pay grade of

DS 11.[4]  Pls.' Opp'n, Ex. 42 (10/16/92 Personnel Action for Glenn); Pls.' Opp'n at 4.  Upon first

---

While the purpose of Rule 56.1 was to "place the burden on the parties and their counsel, who are most familiar with the litigation and the record, to crystallize for the district court the material facts and relevant portions of the record," *Finnegan*, 101 F.3d at 151, the Court shall accept the additional burden placed on it by Defendant and shall not – in this instance – strike Defendant's Statement or accept all of Plaintiffs' facts as undisputed.  Rather, the Court shall carefully parse the record and both sets of "Material Facts Not in Dispute" when outlining the background of this dispute and cite to the record whenever possible.

[3] In her Opposition, Glenn states that the June 17, 1986 Personnel Action promoted her to assistant supervisory inspector.  Pls.' Opp'n at 3.  However, the Personnel Action itself lists "supervisory housing inspector" as the job title to which Glenn was promoted.  Pls.' Opp'n, Ex. 29.

[4] Glenn explains in her Opposition that while the job title does not change when an employee is promoted from supervisory inspector to supervisor, the promotion to DS 11 was the typical

obtaining the position of supervisor, Glenn was responsible for one ward.  Pls.' Opp'n, Ex. 7 (Dep.
of Marva Y. Glenn, Apr. 19, 2001 ("Glenn Dep.")), at 69:16-22.  In 1994, Glenn was made
responsible for Wards 6, 7, and 8.  Glenn Aff. ¶ 11.  In 1995, Glenn was assigned to also cover
Ward 5.  *Id.*  Glenn maintained permanent supervisory responsibility for these four wards – Wards
5, 6, 7, and 8 – until her retirement in September 1997.  *Id.* at ¶¶ 11, 12.  Glenn alleges that her
wards required more work than the other wards.  *Id.*  Further, while her assignment to the four wards
was permanent, her male colleagues were able to rotate through the rest of the wards.  *Id.* at ¶ 12.
Glenn's responsibilities as supervisor for the four wards resulted in her having more complaints to
field than the other supervisors, and, consequently more work than the other supervisors, based on
the raw numbers.  Pls.' Opp'n, Ex. 8 (Dep. of Henry Wilson Howze, Aug. 14, 2001 ("Howze
Dep.")), at 129:2-20.  Glenn alleges that she was provided with fewer staff and more work
assignments than her male supervisor colleagues beginning shortly after her membership in the class
action suit against the Department.  Pls.' Opp'n at 3.

　　　　Glenn filed another EEOC complaint against the Department in 1994, alleging sex
discrimination and retaliation.  Pls.' Opp'n at 4.  The 1994 EEOC complaint was precipitated by the
detailing of a male supervisor colleague, Henry Howze, to acting branch chief in November 1994.
*Id.*; *see also id.*, Ex. 8 (Howze Dep.), at 20:19.  Howze had only recently achieved pay grade DS
11, and consequently the position of supervisor.  Pls.' Opp'n at 4; *id.* at Ex. 31 (12/15/94 Personnel
Action for Howze).[5]  Glenn did not receive any other promotions thereafter, and retired as a

───────────────

benchmark.  Pls.' Opp'n at 4 n.2; Glenn Aff. ¶ 5.

　　　　[5]  The copy of this Personnel Action, as provided to the Court, is unreadable.  It is therefore
impossible to determine on what day Howze's promotion to supervisor became effective, or on what
day the action was approved.  The date of the personnel action is based solely on the Plaintiffs'
uncontested statement of the date in their Opposition.  Pls' Opp'n at 4.

supervisor, DS 11, on September 2, 1997.  Pls.' Opp'n at 5; *see also id.*, Ex. 28 (9/3/97 Personnel

Action for Glenn).

In 1996, there was a Reduction in Force ("RIF") planned for the Department.  *Id.* at 5;

Glenn Aff. ¶ 16.  Howze, as acting branch chief, evaluated Glenn's performance that year, despite

the fact that both Howze and Glenn were the same grade and had the same official title.  Pls.' Opp'n

at 5; Glenn Aff. ¶ 16.  The evaluations in 1996 would help determine "bumping" rights when it

came to the RIF.  Pls.' Opp'n at 5; Glenn Aff. ¶ 17.  Howze gave Glenn her first overall Satisfactory

rating, despite the fact that she had been previously rated as Excellent or Outstanding.  Pls.' Opp'n

at 5; Glenn Aff. ¶ 16; *but see* Pls.' Opp'n, Ex. 7 (Glenn Dep.), at 57:5-7 (stating that she received

performance evaluations of satisfactory and excellent early on in her career as a supervisor).  In her

1996 evaluation, Howze rated Glenn's ability to review her subordinates work, Critical Job Element

2, as "Satisfactory" stating that

> Casework, while reviewed in a timely manner, often shows the lack of a thorough
> review as reflected in cases returned for factors such as no documentation, missing facts,
> and/or erroneous information.  Deficiencies in the inspection and reporting process of
> her staff are not routinely addressed, resulting in ineffective casework  . . . . Ms. Glenn
> can be more effective, and her performance in this element improved, if more
> supervisory guidance was provided to subordinate staff to adhere to policies and
> instructions in completing inspections and documentation of casework.   Further
> improvement in the quality of casework produced by subordinate staff could be realized
> were Ms. Glenn to periodically and routinely conduct field audits and evaluations of
> completed work.

Def.'s Mot., Ex. G at 6 (6/24/96 Performance Evaluation) (setting forth the reasons why Howze

rated Glenn Satisfactory in Critical Job Element 2).  While 1996 may have been the first year in

which Glenn received an overall rating of Satisfactory, her 1995 evaluation, in which she was

evaluated by James Aldridge and given an overall rating of Excellent, was not significantly different

as to Critical Job Element 2.  Aldridge noted that

> The review of case work need [sic] improvements.  The type of case work returned for corrections indicates the need to provide clear and concise instructions and guidance to subordinates.  Casework returned also contains careless errors o[r] mistakes which suggest that as mentioned in element one, time is not used in a very productive manner.  Improvements are needed in these areas.

Def. Mot., Ex. G at 12 (6/30/95 Performance Evaluation) (noting why Glenn received a rating of "Satisfactory" on Critical Job Element 2).  Finally, Glenn's 1997 performance evaluation, again completed by Howze, gave her an overall rating of Excellent, but again noted that her ability to review the work of her subordinates was only "Satisfactory" for virtually the same reasons as in 1996 and 1995.  Def. Mot., Ex. G at 4 (7/22/97 Performance Evaluation) (noting why Glenn received a rating of Satisfactory on Critical Job Element 2).

Glenn's performance evaluations from 1995, 1996, and 1997 show that she made improvements in at least one Critical Job Element:  Job Element 1, which evaluated Glenn's ability to plan and distribute work to her staff so that inspections were responded to timely and effectively.  In 1995, Aldridge rated Glenn Satisfactory because "the time is not used wisely, resulting in a loss of manhours.  Improvements are needed in planning materials/monitoring assigned work."  Def.'s Mot., Ex. G at 11 (6/30/95 Performance Evaluation).  In 1996 and 1997, Howze rated Glenn Excellent on Critical Job Element 1, and praised Glenn's "sound judgement" in distributing work to her subordinates based on "[h]er knowledge of the inspection process."  Def.'s Mot., Ex. G at 3 (7/22/97 Performance Evaluation), & 7 (6/24/96 Performance Evaluation).

On August 6, 1997, the District of Columbia's Financial Responsibility and Management Assistance Authority ("Control Board") issued a management directive, which stated in part

> Agency heads are encouraged to review the knowledge, skills, and competencies of all personnel in their respective agencies.  Until such time as the affected agencies have promulgated personnel rules and regulations under the [National Capital Revitalization and Self-Government Improvement Act], affected agency heads may request that the [Control Board] take action to terminate District employees whose services are no

7

longer needed by the District of Columbia government, pursuant to Section 5204 of
Public Law 104-208.

Pls.' Opp'n, Ex. 27 (Management Directive) ¶ 5; Second Am. Compl. ¶ 20.  Glenn testified that

following the issuance of this Management Directive, Theresa Lewis and James Aldridge called a

supervisors meeting at which they announced that the Control Board had converted the

Department's employment status to "at will."  Pls.' Opp'n at 5; Def.'s Mot., Ex. A (Glenn Dep.), at

79:9; Glenn Aff. ¶ 20.  At the meeting, those present were told that they could be terminated without

notice and without lateral competition.  Second Am. Compl. ¶ 21.  Glenn stated that at this meeting

she did not recall being singled out.  Pls.' Opp'n, Ex. 7 (Glenn Dep.), at 81:8–10.  However, at a

subsequent supervisor meeting run by Aldridge, where Glenn had complained about her workload,

she was told by Aldridge that "if you can't perform your duties then you can be . . . fired at will."

*Id*. at 81:15-82:10.  Also occurring at this meeting was a discussion on how to divide the District up

into sectors and Glenn was given Wards 6, 7, and 8.  *Id*. at 82:15-83:5.

Glenn asserts that her Satisfactory performance evaluation in 1996, her 1994 non-selection

for the acting branch chief position, her increased workload, and the 1997 statements by Aldridge

that she could be fired at will if she could not perform her work constituted retaliation for the EEOC

charges she had filed against the Department and for her complaints about her workload.  Second

Am. Compl. ¶ 17; Pls.' Opp'n, Ex. 7 (Glenn Dep.), at 54:18–21 (indicating she got the lower

evaluation because she complained about her workload); *id*. at 83:22 (asserting that she suffered

retaliation for making complaints about her workload in the form of receiving more work).  Further,

Glenn asserts that her non-selection for the position of acting branch chief and her heavier workload

from that of her male colleagues constituted sex discrimination.  Second Am. Compl. ¶ 16; Pls.'

Opp'n Ex. 7, (Glenn Dep.), at 47:10–14 (stating that in 1989 she complained to her immediate

supervisor that she was being discriminated against because of her heavier workload compared to the men).

B.     *Wanda Y. Dickens*

Dickens was initially hired by the predecessor of the Department on June 20, 1976.  Pls.' Opp'n, Ex 37 (1/17/86 Personnel Action for Dickens) (providing Dickens original date of employment).[6]  Dickens' employment with the Department has been anything but free of obstacles. Dickens filed her first EEOC complaint against the Department in 1976, alleging discrimination. Second Am. Compl. ¶ 25; Pls.' Opp'n at 5; Dickens Aff. ¶ 4.  Dickens filed another EEOC complaint against the Department in 1978 alleging gender-based discrimination.  She was subsequently fired from her job in January 1981.  Dickens Aff. ¶ 4.  In response to being fired, Dickens brought suit in Federal District Court for the District of Columbia in 1983 alleging sex discrimination, sexual harassment, hostile work environment, and retaliation.  Dickens Aff. ¶ 5; Pls.' Opp'n Ex. 36 (Consent Decree) (giving the docket number 83-2099, indicating the suit was filed in 1983).  Dickens also appealed her discharge to the Office of Employee Appeals.  Dickens Aff. ¶ 5. In July 1984, the Office of Employee Appeals reinstated Dickens to the Department.  *Id.* at ¶ 7.  In November 1985, following her reinstatement, Dickens entered into a Consent Decree with the Department to settle the suit she had filed in Federal District Court.  *Id.* at ¶ 9; Pls.' Opp'n, Ex. 36 (Consent Decree).  Under the terms of the Consent Decree, Dickens was to be promoted to contact representative, DS 8, and the Department agreed to provide Dickens with paralegal training and to stop harassing her.  Dickens Aff. ¶ 9; Pls.' Opp'n, Ex. 36 (Consent Decree) ¶¶ 1, 3, 6; Pls.' Opp'n,

---

[6]  The date of employment given on the Personnel Action contradicts Dickens' assertion of the date of her employment, 1975, in the Second Amended Complaint.  Second Am. Compl. ¶ 24. Plaintiffs corrected this mistake in their Opposition.  Pls.' Opp'n at 5.

Ex. 37 (1/17/86 Personnel Action for Dickens) (promoting Dickens to DS 8, effective 1/19/86).

Following Dickens' entry into the Consent Decree, Dickens alleges that she continued to be discriminated against by Belva Newsome, Michael Taylor, and Erica Darden.  Pls.' Opp'n at 7. The discrimination and retaliation Dickens allegedly suffered included being written up, yelled at, denied leave, put on absent without leave ("AWOL") status, ostracized, and denied training opportunities offered to other employees.  *Id.*  As a result, Dickens filed "numerous complaints, including EEOC complaints."  *Id.*  Further, the Department ceased paying for Dickens' paralegal training courses after Dickens had completed just three classes; as a result, Dickens has not received her paralegal certificate.  Second Am. Compl. ¶ 27; Pls.' Opp'n at 6–7.

In February 1997, Dickens was detailed, allegedly in retaliation for the complaints she had previously filed, to HID in order to complete "unassembled duties."  Pls.' Opp'n at 7; Dickens Aff. ¶ 11.  Dickens' pay grade remained DS 8 while detailed, despite Dickens' performance of duties for which her male co-workers were receiving pay at DS 9.  Pls.' Opp'n at 7; Dickens Aff. ¶ 11.  While completing this detail, Dickens became aware that the Department was advertising for a paralegal specialist position in the Rental Housing Commission ("RHC"); the position required a paralegal certificate.  Dickens Aff. ¶ 13.  However, as the Department refused to pay for Dickens to complete her training, in violation of the Consent Decree, Dickens did not have the requisite qualifications, and was not selected for the position when she applied in 1989.  *Id.*  Dickens asserts that the person who was chosen for the position had been previously detailed to the position, was less qualified compared to her, and also lacked the proper paralegal certification.  *Id.*

On October 26, 1987, Dickens was again detailed, also allegedly in retaliation for her previous complaints, to the HID; this time her detail was to the HID's Assessment, Court, and Variance Branch, in order to complete "unassembled duties" from her position as a contact

representative in the RHC.  Pls.' Opp'n at 8; *see also id.* at Ex. 38 (10/26/87 Personnel Action for

Dickens) (detailing Dickens to "unassembled duties" in the HID).  Dickens' pay grade remained DS

8 while detailed.  *Id.* at  Ex. 37 ¶¶ 18(a)-(b), 24(a)-(b).  While detailed to this position, Dickens

performed the work of an Assessment, Court, and Variance Coordinator.  Dickens Aff. ¶ 16.  While

Dickens was told she would be promoted to the position at DS 11/12, the position was later

advertised only at DS 9.  *Id.* at ¶ 18.  Although the advertised position differed in pay grade from

that which she expected, Dickens applied for the position anyway; she was not selected and the

position remained vacant.  *Id.*  Dickens' detail at the HID Assessment, Court, and Variance Branch

lasted until 1991, when Dickens was again detailed, this time to the Office of Complaints in the

Office of Compliance.  *Id.* at ¶ 26.

In 1991, Dickens filed an EEOC complaint against the HID on the behalf of herself and

other females, including Plaintiff Glenn, in HID relating to sex discrimination, retaliation, violation

of the Equal Pay Act, and sexual harassment.  *Id.* at ¶ 21.  This complaint eventually resulted in a

class action lawsuit, of which Dickens was a member, filed against the Department.  *Id.*  Dickens'

assignment to the Office of Complaints came after the class action suit was filed.  *Id.* at 26.  Dickens

alleges that the reassignment was in retaliation for the filing of the lawsuit.  *Id.*  The reassignment

came with a job title that was an improvement over her situation in HID; however, the job title was

that of contact representative, DS 8, the same position she held prior to her detail to HID in 1987.

*Id.*; Pls.' Opp'n, Ex. 41 (Personnel Action for Dickens, effective 8/11/91).  A male, Herb Edwards,

was performing this same job at DS 9.  Dickens Aff. ¶ 26.  In 1992, Dickens applied for, and

received, one of two dispute resolution specialist positions in the Office of Complaints.  *Id.* at ¶ 27.

Dickens was promoted to DS 9 as a result.  *Id.*; Pls.' Opp'n Ex. 47 (3/4/92 Personnel Action for

Dickens) (promoting Dickens to Dispute Resolution Specialist, DS 9, effective 3/8/92).

Dickens performed her tasks as a dispute resolution specialist at the full performance level of DS 11. Dickens Aff. ¶ 28. However, despite her requests and despite her supervisors recommendations, Dickens did not receive the career ladder promotion to DS 11. *Id.* In December 1994, after Dickens had been made aware that a Reduction in Force ("RIF") would occur, Dickens filed an administrative complaint regarding the failure of the Department to promote her. *Id.* at ¶ 29. Dickens was served with a Letter of Direction upon her return from work after the Christmas holidays that year. *Id.* While Dickens appealed the Letter of Direction to both the acting chief of the Office of Compliance and the Director, the Director denied the appeal in 1995. *Id.* Dickens appealed the denial, and in 1996, the Department agreed to change Dickens evaluation from Excellent to Outstanding in order to save her from being RIF-ed. *Id.*

Dickens continued to file administrative complaints in 1994, 1995, and 1997 as a result of the alleged discrimination she continued to face at the Office of Compliance in the form of harassment, sex discrimination, and retaliation. *Id.* at ¶¶ 30, 31. Dickens also alleged she was isolated from her peers because of her "history of asserting [her] rights and complaining of sexual discrimination." *Id.* at ¶ 31. In August 1997, Mimi Jones, Chief of the Office of Compliance, called a meeting in which she announced that the Control Board had taken over and that employees could be fired at will. *Id.* at ¶ 35. Prior to this meeting, Jones had told the mostly male investigators and attorneys that her priority was to preserve their jobs, and not those of the support staff. *Id.* at ¶ 34. Dickens was one of six support staff employees, and one of only two staff employees eligible to take advantage of the "easy out" early retirement package the Department was offering. *Id.* at ¶¶ 32, 34. Jones' announcement that employees could be fired at will came in the final weeks of the

Department's offer of the early retirement package. *Id*. at ¶ 36.  Around this time, other employees

saw Dickens' position on the RIF list. *Id*. at ¶ 37.  Dickens decided to take the early retirement

option in September 1997, in order to avoid the possibility that she would lose her position and be

denied her retirement benefits. *Id*. at 39; Def.'s Mot. at 4.[7]

C.      *Facts Related to this Complaint*

---

[7] Plaintiffs, in their Opposition to Defendant's Motion for Summary Judgment, make the
assertion that Defendant wrongfully withheld certain discovery materials. *See* Pls.' Opp'n at 2, 13-
17, 33-34.  Specifically, Plaintiffs contend that Defendant only produced roughly 60 personnel files
out of an identified 147 relevant personnel files. *See* Pls.' Surreply at 3-4.  Plaintiffs argue that this
partial production was in violation of this Court's order compelling discovery, *id*. (citing *Glenn v.
Williams*, 209 F.R.D. 279 (D.D.C. 2002), and impaired their use of statistical proof to establish that
Defendant maintained a "hostile, discriminatory and retaliatory system," Pls.' Opp'n at 34.  As
such, Plaintiffs argue that "adverse inferences against Defendants are warranted on Plaintiffs' hostile
work environment, discrimination, retaliation and constructive discharge claims."  Pls.' Surreply at
5.  In response, Defendant claims that (1) good faith efforts were made to produce all requested
discovery; (2) Plaintiffs failed to proffer sufficient facts upon which the Court can make a
determination of their spoliation claims; and (3) Plaintiffs could have obtained the information from
other sources, such as the EEOC, where discovery was equally available to all parties.  Def.'s Reply
at 1-2.

While the withholding of discovery is certainly an important concern, four points are in
order.  First, Defendant did provide a substantial number of personnel files, roughly one-half of the
total focused on by Plaintiffs, which could have at least laid the basis for or given some indication
supporting a statistical argument.  This is not a case where the defendant completely ignored a
discovery request and failed to provide any materials.  Second, Defendant is correct that much of
this material could have been obtained from a third-party equally accessible to all parties – the
EEOC.  While Plaintiffs complain that Defendant never made them aware of this fact, it is not
necessarily Defendant's responsibility to point Plaintiffs toward publicly-available material held by
third-parties.  Third, based on Defendant's filings, the Court sees no evidence that Defendant
somehow relied upon any withheld information in making its arguments, and the Court's analysis in
this Memorandum Opinion is certainly not predicated upon such withheld information.  Fourth,
and most importantly, such evidence would ultimately have been irrelevant in light of the Court's
findings *infra*.  As will be discussed, the vast majority of Plaintiffs' claims are time-barred, and
Plaintiffs' surviving claims generally fail because Plaintiffs are unable to make out a *prima facie*
case for their allegations.  As such, the need for statistical information relating to the personnel
matters of *other* employees – which is relevant if a plaintiff makes it to the third prong of the
*McDonnell Douglas* analysis and must provide evidence indicating discrimination *vel nom* – is
obviated.  Simply, given their failures at the *prima facie* stage, Plaintiffs do not reach the stage
where the Court would have to consider such evidence.  Accordingly, the Court sees no justification
to allow the "adverse inferences against Defendants" that Plaintiffs request.

Glenn filed her EEOC charge that formed the basis of this action on January 21, 1998. Second Am. Compl. ¶ 4; Pl.'s Opp'n, Ex. 7 (Glenn Dep.), at 111:9-11.  Dickens filed her EEOC charge on or about January 21, 1998.  *Id.*[8]; Dickens Aff. ¶ 41.  Glenn's Right to Sue notice was dated January 26, 1998.  Pls.' Opp'n, Ex. 1 (Right to Sue Notice).  Dickens testified at her deposition that Glenn's Right to Sue notice was postmarked six days after the date appearing on Glenn's Right to Sue notice, therefore on February 1, 1998.  Def.'s Mot., Ex. B, (Dep. of Wanda Y. Dickens, Jan. 16, 2001 ("Dickens Dep.")), at 12:2-12.  While the testimony provides the Court with a mailing date rather than a date of receipt, both Plaintiffs and Defendant have agreed that the date of the postmark, February 1, 1998, was the date on which Glenn received her Right to Sue notice. Def.'s Mot. at 13; Pls.' Opp'n at 17 (providing the date on which Glenn's 90-day period for filing a complaint in federal court would expire as May 2, 1998, 90 days after February 1, 1998).  Dickens' Right to Sue notice was dated February 13, 1998.  Pls.' Opp'n, Ex. 1 (Right to Sue Notice).  In her deposition, Dickens testified that the postmark on her Right to Sue notice was five days after the date on the letter, therefore, the notice was postmarked February 18, 1998.  Def.'s Mot., Ex. B. (Dickens Dep.), at 14:1–5.  As with Glenn, the parties have adopted the date of the postmark, February 18, 1998, as the date on which Dickens received her Right to Sue notice.  Def.'s Mot. at 40; Pls.' Opp'n at 17 (providing the date on which Dickens 90-day period for filing a complaint in federal court would expire as May 19, 1998, 90 days after February 18, 1998).

---

[8] Plaintiffs failed to include their original EEOC complaints as exhibits in this case.  This Court cannot, therefore, ascertain exactly the dates upon which the EEOC complaints were filed.  In addition, the allegation in the EEOC complaints cannot be verified.  However, Defendant does not contest the absence of the EEOC complaints from the record.  As such, this Court will blindly rely on the assertions of the parties as to the content and dates of the EEOC complaints.

Preceding the filing of the instant action, Plaintiffs had filed a *pro se* complaint and applications to proceed *in forma pauperis* on April 24, 1998.  Def.'s Mot. at 15; Pls.' Opp'n at 18.; Pls.' Opp'n, Ex. 1 (showing a date stamp from the Clerk's Office of April 24, 1998); Pls.' Opp'n Ex. 4 (June 11, 1998 Memorandum Opinion stating that Plaintiffs filed a complaint and applications to proceed *in forma pauperis* in April 1998).  The applications to proceed *in forma pauperis* were denied, and notices of the denial were mailed on May 21, 1998.  Dickens Aff. ¶ 3; Glenn Aff. ¶ 3.  Plaintiffs filed the complaint, and paid the appropriate filing fees, to initiate this litigation on May 22, 1998.  *See* Compl. (Dkt. Entry #1); Pls.' Opp'n at 18.  Plaintiffs' complaint was therefore filed three days outside the 90-day limit for Dickens, and twenty days outside the 90-day period for Glenn.

Plaintiffs set forth a five-count Second Amended Complaint charging that the abovementioned actions taken on behalf of the Defendant violated Title VII and resulted in a breach of contract.  Plaintiffs' Title VII claims are contained in Counts I and II.  Plaintiffs' breach of contract claims are contained in Counts III and IV.  In Count I, Plaintiffs allege sex discrimination based on the Department's alleged denial to the Plaintiffs of "benefits of employment to which they were entitled and creat[ing] a hostile work environment for Plaintiffs, because of their gender." Second Am. Compl. ¶¶ 34–38 (Count I).  Count II alleges that the Department retaliated against Plaintiffs for their previous EEOC charges and other complaints of discrimination, all of which "are protected conduct under Title VII."  *Id.* ¶¶ 39–43 (Count II).

Count III is based on the Department's alleged breach of the Consent Decree between it and Dickens, entered into on November 15, 1985.  This Count alleges that the Department (1) continued to discriminate against Dickens on the basis of her gender; (2) retaliated against Dickens for her 1976 discrimination charge and her 1983 retaliation charge that resulted in the Consent Decree; (3)

failed to pay for the paralegal course work necessary for Dickens to complete the paralegal training

program; and (4) promoted Dickens three months late under the terms of the Consent Decree. *Id.* ¶¶

44–50.  Count IV alleges that the Department breached the Settlement Agreements between it and

Glenn when it (1) continued to discriminate against Glenn; (2) continued to retaliate against Glenn;

and (3) failed to provide Glenn with the training opportunities called for in the Settlement

Agreements. *Id.* at ¶¶ 51–56.  Finally, Count V alleges the common law claim of constructive

discharge based upon the Department's misrepresentation to Plaintiffs that they could be terminated

at will; according to Plaintiffs, when faced with this misrepresentation, they "had no real choice but

to retire and thus resigned rather than risk being fired." *Id.* at ¶¶ 57–62 (Count V).

Based upon the assertions contained in Count I (sex discrimination), Count II (retaliation)

Count III (breach of Consent Decree), Count IV (breach of Settlement Agreements), and Count V

(wrongful termination of employment/constructive discharge), Plaintiffs request: (1) retroactive

promotion to the GS-13 grade level; (2) back pay; (3) monetary damages; (4) payment for annual

sick leave from September 1997 to the present; (5) the addition of an appropriate amount of time to

their service for purposes of calculating retirement and any other benefits; (6) punitive damages; (7)

attorneys' fees and costs; and (8) any other relief that this Court finds just. *Id.* at ¶¶ 63, 64 (Prayer

for Relief).

## II: LEGAL STANDARD

A party is entitled to summary judgment if the pleadings, depositions, and affidavits

demonstrate that there is no genuine issue of material fact in dispute and that the moving party is

entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Tao v. Freeh*, 27 F.3d 635, 638

(D.C. Cir. 1994).  Under the summary judgment standard, Defendant, as the moving party, bears the

"initial responsibility of informing the district court of the basis for [its] motion, and identifying

those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits which [it] believe[s] demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Plaintiff, in response to Defendants' motion, must "go beyond the pleadings and by [his] own affidavits, or depositions, answers to interrogatories, and admissions on file, 'designate' specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal citations omitted).

Although a court should draw all inferences from the supporting records submitted by the nonmoving party, the mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). To be material, the factual assertion must be capable of affecting the substantive outcome of the litigation; to be genuine, the issue must be supported by sufficient admissible evidence that a reasonable trier-of-fact could find for the nonmoving party. *Laningham v. U.S. Navy*, 813 F.2d 1236, 1242-43 (D.C. Cir. 1987); *Liberty Lobby*, 477 U.S. at 251, 106 S.Ct. 2505 (the court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law"). "If the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50, 106 S.Ct. 2505 (internal citations omitted). "Mere allegations or denials in the adverse party's pleadings are insufficient to defeat an otherwise proper motion for summary judgment." *Williams v. Callaghan*, 938 F. Supp. 46, 49 (D.D.C. 1996). The adverse party must do more than simply "show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Instead, while the movant bears the initial responsibility of identifying those portions of the record that demonstrate the absence of a genuine issue of material

fact, the burden shifts to the non-movant to "come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Id.* at 587, 106 S.Ct. 1348 (citing Fed. R. Civ. P. 56(e)) (emphasis in original).

Importantly, "[w]hile summary judgment must be approached with specific caution in discrimination cases, a plaintiff is not relieved of her obligation to support her allegations by affidavits or other competent evidence showing that there is a genuine issue for trial." *Morgan v. Fed. Home Loan Mortgage Corp.*, 172 F. Supp. 2d 98, 104 (D.D.C. 2001) (quoting *Calhoun v. Johnson*, No. 95-2397, 1998 WL 164780, at *3 (D.D.C. Mar. 31, 1998) (internal citation omitted), *aff'd*, No. 99-5126, 1999 WL 825425, at *1 (D.C. Cir. Sept. 27, 2000)); *see also Marshall v. James*, 276 F. Supp. 2d 41, 47 (D.D.C. 2003) (special caution "does not eliminate the use of summary judgment in discrimination cases") (citing cases). "Summary judgment is not a 'disfavored procedural shortcut,' but is an integral procedural tool which promotes the speedy and inexpensive resolution of every case." *Marshall*, 276 F. Supp. 2d at 47 (quoting *Celotex Corp.*, 477 U.S. at 327). Accordingly, the Court reviews the defendant's motion for summary judgment under a "heightened standard" that reflects "special caution." *Aka v. Washington Hosp. Ctr.*, 116 F.3d 876, 879 (D.C. Cir. 1997) (internal quotations omitted), *overturned on other grounds*, 156 F.3d 1284 (D.C. Cir. 1998) (en banc). Nonetheless, while this special standard is more exacting, it is not inherently preclusive. Although more circumspect, the Court will continue to grant a motion for summary judgment in which the nonmoving party has failed to submit evidence that creates a genuine factual dispute and the moving party is entitled to a judgment as a matter of law.

## III: DISCUSSION

This Court will address Defendant's Motion for Summary Judgement by first resolving the threshold issue of whether Plaintiffs' Complaint was timely filed. This Memorandum Opinion will

then proceed to address Plaintiffs breach of contract claims, followed by an analysis of Plaintiffs

Title VII claims, and shall conclude with an examination of Plaintiffs' constructive discharge claim.

    A.       *Timeliness of Plaintiffs' Complaint*

    In order to have a timely filed Title VII complaint, Plaintiffs were required to file their

Complaint with the district court within ninety days of receiving their Right to Sue notices from the

EEOC.  42 U.S.C. § 2000e-16(c).  Here, Glenn received her Right to Sue notice, dated January 26,

1998, on February 1, 1998; as such, Glenn was required to file her suit on or by May 2, 1998.  Pls.'

Opp'n Ex. 1 (Glenn Right to Sue notice) at 7; Def.'s Mot. Ex. B (Dickens Dep.), at 12:7-8; Def.'s

Mot at 13; Pls.' Opp'n at 17.  Dickens received her Right to Sue notice, dated February 13, 1998,

on February 18, 1998; accordingly, Dickens was required to file her suit on or by May 19, 1998.

Pls.' Opp'n Ex. 1 (Dickens Right to Sue notice) at 8; Def.'s Mot., Ex. B. (Dickens Dep.), at

13:16–17; Def.'s Mot. at 40; Pls.' Opp'n at 17.

    On April 24, 1998, Plaintiffs filed a *pro se* complaint in the Federal District Court for the

District of Columbia, accompanied by applications to proceed *in forma pauperis* ("IFP").  Pls.'

Opp'n at 18; *see also id.*, Ex. 1 (original complaint with Apr. 24, 1998 date stamp) at 1; *id.*, Ex. 4

(6/11/98 Memorandum Opinion and Order of this Court indicating that a prior complaint and

applications to proceed IFP were filed by Plaintiffs in April 1998); Dickens Aff. ¶ 2; Glenn Aff. ¶ 2.

The applications were denied and the complaint dismissed, notice of which was mailed to Plaintiffs

on May 21, 1998.  Pls.' Opp'n at 18; *id.* at Ex. 4 (6/11/98 Memorandum Opinion and Order of this

Court noting that the applications were denied); Dickens Aff. ¶ 3; Glenn Aff. ¶ 3.  Plaintiffs filed

this Complaint on May 22, 1998, paying all filing fees.  Dkt. Entry #1; Def.'s Mot. at 13, 40; Pls.'

Opp'n at 18; *id.*, Ex. 4 (6/11/1998 Memorandum Opinion and Order of this Court noting that filing

fees for this action were paid). However,  May 22, 1998 – the date that the Complaint in this action

was filed – was a full ten days after Glenn's ninety days had run and three days after Dickens'

ninety days had run. Accordingly, in order for Plaintiffs' Complaint to avoid being time barred, the

doctrine of equitable tolling must apply. *See* 42 U.S.C. § 2000e-16(c).

For the doctrine of equitable tolling to apply, Plaintiffs must both plead and prove "the

equitable reasons for her failure to meet the time limit for filing suit in the district court." *Baker v.*

*Henderson*, 150 F. Supp. 2d 17, 21 (D.D.C. 2001). The courts in the Circuit, however, are limited

to applying equitable tolling to "only . . . narrowly tailored circumstances." *Id.* To be afforded the

extra time to file through equitable tolling, Plaintiffs' must have "exercis[ed] due diligence, and the

[Plaintiffs'] excuse must be more than a 'garden variety claim of excusable neglect.'" *Id.* at 22.

The four circumstances this Circuit has recognized in which a court may properly allow for

equitable tolling in Title VII cases are

> where a claimant has received inadequate notice, where a motion for appointment of
> counsel is pending and equity would justify tolling the statutory period until the motion
> is acted upon, where the court has led the plaintiff to believe that she had done
> everything required of her, or where affirmative misconduct on the part of a defendant
> lulled the plaintiff into inaction.

*Mondy v. Sec'y of the Army*, 845 F.2d 1051, 1057 (D.C. Cir. 1988) (citations and alterations

omitted).

The general rule is that the clerk of court will not "accept for filing a complaint that is not

accompanied by a filing fee until after the Court has granted a petition for leave to proceed *in forma*

*pauperis*." *Washington v. White*, 231 F. Supp. 2d 71, 75 (D.D.C. 2002). In *Baker*, the defendant

conceded the point that when plaintiff filed her *in forma pauperis* application, the 90-day statute of

limitations was tolled until the court ruled on her request. *Baker*, 150 F. Supp. 2d at 19. The

plaintiff in *Baker* filed her *in forma pauperis* application and complaint seven days before the

ninety-day statute of limitation period had run.  She therefore had seven days from the date on which

the court denied her application to re-file.  *Id*. at 21.  While the defendant in *Baker* did not dispute

the tolling of the statutory period during the time in which the court was reviewing plaintiff's *in*

*forma pauperis* application, Defendant in this case does.  There is a significant body of case law,

within and without the Circuit, indicating that tolling should apply in such circumstances.  *See*

*Paulk v. Dep't of Air Force, Chanute Air Force Base*, 830 F.2d 79, 83 (7th Cir. 1987) (*cited in*

*Mondy*, 845 F.2d at 1057); *Washington*, 231 F. Supp. 2d at 75 (citing cases supporting the tolling

of the ninety-day statute of limitations when an *in forma pauperis* application is filed); *El. v.*

*Belden*, 360 F. Supp. 2d 90, 93 (D.D.C. 2004) (denying defendant's motion to dismiss for failure to

file a timely complaint on the basis that the plaintiff filed an *in forma pauperis* application within

the ninety-day period which tolled the statute of limitations); *Amiri v. Stoladi Prop. Group*, --- F.

Supp. 2d ----, No. Civ.A. 05-447(RJL), 2005 WL 3211682, at * 2 (D.D.C. Oct. 4, 2005) (citing

*Washington* as the basis of its holding that the ninety-day statute of limitations is tolled when an *in*

*forma pauperis* application is filed).

The Court finds these cases persuasive, and holds that the ninety-day period was tolled as to

each Plaintiff when they filed their *in forma pauperis* applications on April 24, 1998.  Plaintiffs'

applications to proceed *in forma pauperis* were received by the clerk's office on April 24, 1998,

eight days before the running of Glenn's ninety-day period and twenty-five days before the running

of Dickens' ninety-day period.  One day after notice of the denial of their *in forma pauperis*

applications were mailed, Plaintiffs filed this Complaint.  If the ninety-day period was tolled on the

date Plaintiffs applied to proceed *in forma pauperis*, then they filed this Complaint well within their

respective ninety-day periods.  Plaintiffs acted diligently by taking prompt action in filing this

Complaint; in addition, they were diligent in filing their initial complaint well within the ninety-day period.  Through no fault of their own, the instant Complaint was filed outside the ninety-day period.  For these reasons, the Court holds that the Complaint was timely filed and Defendant Motion for Summary Judgment is denied as to this matter.

B.     *Breach of Contract Claims*

In general, when a party files an opposition to a dispositive motion and does not address all the arguments therein, the Court can consider "those arguments the party failed to address conceded."  *Buggs v. Powell*, 293 F. Supp. 2d 135, 141 (D.D.C. 2003) (citing *FDIC v. Bender*, 127 F.3d 58, 67-68 (D.C. Cir. 1997); *Stephenson v. Cox*, 223 F. Supp. 2d 119, 121 (D.D.C. 2002)).  Here, Defendant set forth arguments relating to Counts III and IV that Plaintiffs never responded to in their Opposition.  Both Counts will be briefly addressed below.

1.     Plaintiff Dickens's claim of breach of the 1985 Consent Decree is barred
       under the statute of limitations (Count III)

Count III of the Second Amended Complaint seeks relief for Dickens based on the Department's alleged breach of the Consent Decree intended to settle a Title VII suit filed by Dickens in the Federal District Court for the District of Columbia in 1983.  The suit arose from Dickens' 1981 firing from the employ of the District, allegedly in retaliation, for Dickens' 1978 EEOC charge of sex discrimination.  Dickens Aff. ¶¶ 4, 5.  In 1983, Dickens filed a Title VII suit in the Federal District Court for the District of Columbia.  Dickens Aff. ¶ 5; Pls.' Opp'n, Ex. 36 (Consent Decree) (indicating the docket number of the action as Civ. No. 83-2099).  The Consent Decree between the Department and Dickens required the Department to stop discriminating and retaliating against Dickens and to pay for Dickens to obtain her paralegal certificate.  Pls.' Opp'n, Ex. 36 (Consent Decree) at ¶¶ 3, 6.  It also required the Department to promote her to contact

representative, DS 8, immediately upon the signing of the Consent Decree. *Id.* at ¶ 1. The Consent

Decree was signed by all parties on November 15, 1985. *Id.* at 3 (Consent Decree signature page).

Dickens was not promoted to Contact Representative, DS 8, until January 19, 1986, two months

after the Consent Decree was signed. Pls.' Opp'n, Ex. 37 (1/17/86 Personnel Action for Dickens)

(giving an effective date of 1/19/86); Second Am. Compl. ¶ 27 (stating Dickens was not promoted

for three months, but the record clearly shows the Department only failed to promote her for two

months). Following the execution of the Consent Decree, Dickens entered a paralegal training

program at George Washington University where she completed three courses. Def.'s Mot. Ex. B

(Dickens Dep.), at 25:22-26:1, 26:19-20, 27:2-4; Second Am. Compl. ¶ 27. In early 1986, after

Dickens completed those three courses, the Department refused to pay for the additional classes

Dickens needed to complete her certificate. Def.'s Mot. Ex. B (Dickens Dep.), at 26:8–9, 11;

Second Am. Compl. ¶ 27. In addition, Dickens asserts that the Department continued to

discriminate and retaliate against her in violation of the Consent Decree. Second Am. Compl. ¶¶ 28,

46.

Defendant asserts that summary judgment should be granted on this Count because Dickens

failed to file suit for claims based on breach of contract within the District of Columbia's three-year

statute of limitations. Def.'s Mot. at 49; D.C. Code § 12-301(7). According to Defendant, the

action accrued in 1986 when the Department refused to pay for the classes Dickens needed to

complete for her paralegal certificate, meaning that the statute of limitations on this claim expired in

1989. Def.'s Mot at 50. Dickens has had an ample opportunity to reply to this argument and has

failed to do so in either her Opposition or any other subsequent pleading. For this reason, the Court

construes Dickens' failure to respond as a concession that Defendant's arguments on this issue are

meritorious; as such, the Court grants Defendant's Motion for Summary Judgment with respect to

Count III of Plaintiffs' Second Amended Complaint. *See, e.g., Hopkins v. Women's Div. Gen. Bd. of Global Ministries*, 238 F. Supp. 2d 174, 178 (D.D.C. 2002) ("It is well understood in this Circuit that when a plaintiff files an opposition to a motion to dismiss addressing only certain argument raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded.") (citations omitted); *Bancoult v. McNamara*, 227 F. Supp. 2d 144, 149 (D.D.C. 2002) ("[I]f the opposing party files a responsive memorandum, but fails to address certain arguments made by the moving party, the court may treat those arguments as conceded, even when the result is dismissal of the entire case.") (citations omitted); *Day v. D.C. Dep't of Consumer & Regulatory Affairs*, 191 F. Supp. 2d 154, 159 (D.D.C. 2002) ("If a party fails to counter an argument that the opposing party makes in a motion, the court may treat that argument as conceded.") (citations omitted); *Stephenson v. Cox*, 223 F. Supp. 2d 119, 122 (D.D.C. 2002) (noting that it is not the "[C]ourt's role . . . to act as an advocate for the [parties] and construct legal arguments on [their] behalf in order to counter those in the motion to dismiss") (citations omitted); *see also United States v. Real Property Identified as: Parcel 03179-005R*, 287 F. Supp. 2d 45, 61-62 (D.D.C. 2003) (discussing the fact that fail to address an argument equates to a concession of that argument under the Local Civil Rules). Moreover, upon an independent analysis of the evidence presented and relevant case law, the Court concludes that Defendant's argument is meritorious; given the three-year statute of limitations for claims based on breach of contract within the District of Columbia, Dickens' claim based on the November 15, 1985 Consent Decree is clearly time-barred.

> 2.   This Court does not have the jurisdiction to grant relief based on breach of Plaintiff Glenn's Settlement Agreement (Count IV)

Count IV of the Second Amended Complaint, seeks relief for Glenn based on the

Department's breach of a Settlement Agreement entered into between Glenn and the Department to resolve an EEOC charge Glenn filed in 1989 which alleged sex discrimination against the Department.  Second Am. Compl. ¶¶ 12, 51–56.  Glenn contends that the Department breached the Settlement Agreement by continuing to discriminate against her and by failing to provide her with "certain [unspecified] training opportunities."  *Id*. at ¶¶ 12, 54.  In its Motion for Summary Judgment, Defendant argues that the Settlement Agreement had been reached before the EEOC and as a result, the EEOC was the body vested with jurisdiction to resolve matters of enforcement of the Agreement.  Def.'s Mot. at 40.  Defendant concludes the argument by stating that Glenn's failure to exhaust her administrative remedies by applying to the EEOC for enforcement effectively bars this Court from granting Glenn relief.  *Id*.  Glenn had ample opportunity to respond to this argument, but failed to do so in her Opposition or any other subsequent pleading, therefore the Court will construe Glenn's failure to respond as a concession that Defendant's argument on this issue has merit, and will grant Defendant's Motion for Summary Judgment as to Count IV.  *See Rafferty v. NYNEX Corp.*, 744 F. Supp. 324, 331 (D.D.C. 1990), *aff'd*, 60 F.3d 844 (D.C. Cir. 1995) (holding that where plaintiff's memorandum in opposition offers no rebuttal to defendant's argument, plaintiff may be deemed to have conceded the issue); *see also Moncrief v. Daro Realty, Inc.*, Civ. No. 03-762(GK), 2005 WL 1119794, at *1 (D.D.C. Apr. 28, 2005) (same); *Farmer v. Hawk-Sawyer*, 69 F. Supp. 2d 120, 124 (D.D.C. 1999) (same).  Moreover, upon an independent analysis of the evidence presented and relevant case law, the Court concludes that Defendant's argument is meritorious:  Glenn was required to exhaust her administrative remedies on this claim before proceeding given the terms of the Settlement Agreement, and her failure to do so bars the Court from considering this claim.

C.      *Title VII Claims*

Plaintiffs' final set of claims are brought pursuant to Title VII, which states that all

personnel actions affecting employees "shall be made free from any discrimination based on race,

color, religion, sex, or national origin."  42 U.S.C. § 2000e-16(a).  It is uncontested that Plaintiffs

were employees during the relevant time period and Defendant is an employer within the meaning of

Title VII.  The Court exercises jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1331.

To prove a Title VII violation, Plaintiffs must demonstrate by a preponderance of the

evidence that the actions taken by the Agency were "more likely than not based on the consideration

of impermissible factors" such as gender.  *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248,

254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) (internal quotation marks and citation omitted).

Where, as here, the record contains no direct evidence of discrimination, it is necessary to employ

the *McDonnell Douglas* tripartite burden-shifting framework.  *Cones v. Shalala*, 199 F.3d 512,

516 (D.C. Cir. 2000) (citing *McDonnell Douglas v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36

L.Ed.2d  668 (1973)).  It is the district court's responsibility to closely adhere to this analysis and go

no further, as it does not sit as a "super-personnel department that reexamines an entity's business

decisions."  *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (internal

citation and quotation marks omitted).

Under the *McDonnell Douglas* paradigm, Plaintiffs have the initial burden of proving by a

preponderance of the evidence a "*prima facie*" case of discrimination.  *McDonnell Douglas*, 411

U.S. at 802, 93 S.Ct. 1817.  Since Plaintiffs allege that they were discriminated against through

their non-selection, their alleged disparate treatment, the retaliation that they suffered, and the hostile

work environment they endured, they must prove the *prima facie* case for each type of

discrimination asserted.  If they succeed, the burden shifts to the Defendant to articulate some

26

legitimate, non-discriminatory reason for Plaintiffs' non-selection and alleged disparate treatment, retaliation, and hostile workplace, and to produce credible evidence supporting its claim. *Id.* Defendant's burden is only one of production, and it "need not persuade the court that it was actually motivated by the proffered reasons." *Burdine*, 450 U.S. at 254, 101 S.Ct. 1089; *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) ("[T]he determination that a defendant has met its burden of production (and has thus rebutted any legal presumption of intentional discrimination) can involve no credibility assessment."). As such, "the *McDonnell Douglas* framework shifts intermediate evidentiary burdens between the parties, [t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Morgan v. Fed. Home Loan Mortgage Corp.*, 328 F.3d 647, 651 (D.C. Cir. 2003), *cert. denied*, 540 U.S. 881, 124 S. Ct. 325, 157 L.Ed.2d 146 (2003); *see also Burdine*, 450 U.S. at 253, 101 S.Ct. 1089.

If Defendant is successful, then "the *McDonnell Douglas* framework -- with its presumptions and burdens -- disappear[s], and the sole remaining issue [is] discrimination *vel non*." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142-43, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (internal citations and quotation marks omitted); *see also Burke v. Gold*, 286 F.3d 513, 520 (D.C. Cir. 2002) (once defendant offers a non-discriminatory explanation for its actions, the presumption of discrimination "simply drops out of the picture") (quoting *St. Mary's Honor Ctr.*, 590 U.S. at 511, 113 S.Ct. 2742) . At that point, Plaintiffs have the burden of persuasion to show that Defendant's proffered reason was not the true reason for the employment decision. *Burdine*, 450 U.S. at 256, 101 S.Ct. 1089. Pretext may be established "directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the

employer's proffered explanation is unworthy of credence." *Id.* at 256, 101 S.Ct. 1089; *see also Reeves*, 530 U.S. at 143, 120 S.Ct. 2097.  "Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive." *Reeves*, 530 U.S. at 147, 120 S.Ct. 2097 (citing *St. Mary's Honor Ctr.*, 590 U.S. at 517, 113 S.Ct. 2742) ("[P]roving the employer's reason false becomes part of (and often considerably assists) the greater enterprise of proving that the real reason was intentional discrimination."); *see also Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1290 (D.C. Cir. 1998) (en banc) ("[A] plaintiff's discrediting of an employer's stated reason for its employment decision is entitled to considerable weight.").  Notably, the Supreme Court has taken care to instruct trial courts that "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves*, 530 U.S. at 148, 120 S.Ct. 2097.  "[T]he trier of fact may still consider the evidence establishing the plaintiff's prima facie case 'and inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual." *Id.* at 143, 120 S.Ct. 2097 (quoting *Burdine*, 450 U.S. at 255 n.10, 101 S.Ct. 1089).

Accordingly, "to survive summary judgment the plaintiff[s] must show that a reasonable jury could conclude from all of the evidence that the adverse employment decision was made for a discriminatory reason." *Lathram v. Snow*, 336 F.3d 1085, 1088 (D.C. Cir. 2003); *see also Aka*, 156 F.3d at 1290.  The D.C. Circuit recently defined "all of the evidence" as "any combination of (1) evidence establishing the plaintiff's prima facie case; (2) evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff, such as independent evidence of discriminatory statements or

attitudes on the part of the employer." *Holcomb v. Powell*, --- F.3d ----, 2006 WL 45853, at *5

(D.C Cir. Jan 10, 2006) (citing *Aka*, 156 F.3d at 1289). "At this stage, if [plaintiff] is unable to

adduce evidence that could allow a reasonable trier of fact to conclude that [defendant's] proffered

reason was a pretext for discrimination, summary judgment must be entered against [plaintiff]."

*Paquin v. Fed. Nat'l Mortgage Ass'n*, 119 F.3d 23, 27-28 (D.C. Cir. 1997). "[T]he court must

consider all the evidence in its full context in deciding whether the plaintiff has met his burden of

showing that a reasonable jury could conclude that he has suffered discrimination." *Aka*, 156 F.3d

at 1290.

While Plaintiffs allege that their claims of sex discrimination and retaliation are actionable

based upon discrete acts, they also advance the theory of continuing violation in order to salvage the

claims if this Court finds the discrete acts in and of themselves cannot establish a claim of sex

discrimination or retaliation.   Plaintiffs also advance a theory of recovery based upon hostile work

environment.   The Court will first address Counts I and II in the context of "discrete acts," and then

shall turn to an examination of the implications of the continuing violation doctrine and Plaintiffs'

hostile work environment claims.

　　　　1.　　Sex Discrimination (Count I)

Plaintiffs attempt to make a case for sex discrimination based on two different theories.

First, Plaintiffs allege that the Department discriminated against them on the basis of sex when it

failed to promote them. Pls.' Opp'n at 31–34, 42–43. Specifically, Glenn's gender discrimination/

failure to promote claim revolves around the Department's decision to appoint Henry Howze, and

not her, as "acting" branch chief in 1994, while Dickens' claim is based on the Department's

frequent denial of an increase in her pay grade.  Second, Plaintiffs allege that the Department treated

them disparately based on their sex. *Id.* at 34–35, 41–42. Both claims relating to each Plaintiff will

be addressed below.

          *a.*    *Glenn*

          i.    Failure to Promote

Glenn alleges that the Department sexually discriminated against her when it failed to make her "acting" branch chief in 1994, instead placing Henry Howze – a male counterpart of Ms. Glenn's who served in the Housing Inspections Division – into the "acting" position. *See* Pl.'s Opp'n, Ex. 8 (Howze Dep.) at 20. Two major problems exist with respect to Plaintiff Glenn's failure to promote claim, necessitating summary judgment in favor of Defendant.

First, Plaintiff Glenn's failure to promote claim is time barred. The discrete act of discrimination, as set forth by Glenn, occurred in 1994 when Howze was made acting branch chief instead of Glenn. Pls.' Opp'n at 4; *id.*, Ex. 8 (Howze Dep.), at 20:17-19; *id.*, Ex. 13 (Howze Resume); Glenn Aff. ¶ 7. Under Title VII, a plaintiff must bring an EEOC charge regarding the alleged discriminatory act within 180 days (if filing directly with the EEOC) or 300 days (if filing first with the state or local agency tasked with handling Title VII violations) of it happening. 42 U.S.C. § 2000e-5(e)(1); *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002) ("A discrete retaliatory or discriminatory act 'occurred' on the day that it 'happened.'"). While Glenn did file an EEOC charge in 1994, Pls.' Opp'n at 4; Glenn Aff. ¶ 14, presumably in response to Howze getting the acting branch chief position, that EEOC charge is not the basis of this suit. Further, even if it was the basis of this suit, (1) there is no indication that it was timely filed within the 180- or 300-day limits set forth in 42 U.S.C. § 2000e-5(e)(1), and (2) a claim filed in 1998, as this one was, would be untimely if it based a portion of its action on an EEOC charge almost four years old. District employees must file suit with the federal district court within 90 days of receipt of their Right to Sue Notice. 42 U.S.C. § 2000e-16(c). Nearly four years

between the filing of the EEOC charge in 1994 and the filing of this action in 1998 precludes relief

based on the 1994 EEOC charge.  In addition, because the act occurred more than 180- or 300-days

before the filing of the this EEOC charge on January 21, 1998, the claim is barred by 42 U.S.C.

§ 2000e-5(e)(1).

Second, even assuming *arguendo* that Glenn's failure to promote claim was timely raised by

her, she is unable to establish the basic *prima facie* case necessary to support such a claim.  In order

to establish a *prima facie* case for a failure to promote claim, a plaintiff must establish that:  (1) she

is a member of a protected class; (2) she sought a promotion for which she was qualified; (3) she

was denied that promotion; and (4) "other employees of similar qualifications . . . were indeed

promoted at the time the plaintiff's request for promotion was denied."  *Bundy v. Jackson*, 641 F.2d

934, 951 (D.C. Cir. 1981); *Taylor v. Small*, 350 F.3d 1286, 1294 (D.C. Cir. 2003); *see also*

*Nurriddin v. Goldin*, 382 F. Supp. 2d 79, 95 (D.D.C. 2005); *Nayar v. Howard Univ.*, 881 F. Supp.

15, 19-20 (D.D.C. 1995).

In addition, under 42 U.S.C. § 2000e-16(c), in order for a District of Columbia employee to

state a claim of discrimination, the party must be "aggrieved" in some fashion – that is, that being

placed in the position of "acting" branch chief was, in fact, a promotion or otherwise affected a

colorable employment action.  42 U.S.C. § 2000e-16(c); *Brown v. Brody*, 199 F.3d 446, 455 (D.C.

Cir. 1999).  In short, Glenn must "show that [she] ha[s] suffered an adverse personnel action in

order to establish a *prima facie* case under the *McDonnell Douglas* framework."  *Brown*, 199 F.3d

at 455.  An adverse employment action has been defined by the Supreme Court, and applied by the

D.C. Circuit, as "a significant change in employment status, such as hiring, firing, failing to

promote, reassignment with significantly different responsibilities, or a decision causing a significant

change in benefits."  *Taylor*, 350 F.3d at 1293 (quoting *Burlington Indus. Inc. v. Ellerth*, 524 U.S.

742, 762, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1994)).  Therefore, Glenn must not only prove the elements set forth in *Bundy* for a claim of failure to promote, but she must also show that the Department's action in making Howze acting branch chief rather than selecting her constituted an adverse employment action.

In *Taylor v. FDIC*, the D.C. Circuit specifically refused to accept the proposition "that temporary designations as acting section chief is one of the 'terms conditions, or privileges of employment.'"  *Taylor v. FDIC*, 132 F.3d 753, 764–65 (D.C. Cir. 1997).  While the court was basing this holding on the Resolution Trust Corporation Whistleblower Act, 12 U.S.C. § 1441a(q)(1), its reasoning was premised on how other circuits had interpreted Title VII's identical "terms, conditions, or privileges" language in 42 U.S.C. § 2000e-2(a).  *Taylor v. FDIC*, 132 F.3d at 764 (citing cases from the Fourth and Fifth Circuits which had held that Title VII did not focus on "interlocutory or mediate decisions having no effect upon employment conditions").  However, the court denied plaintiffs' claims of discrimination based on the failure of their employer to appoint them "acting section chief when their supervisors temporarily left the office" because the denials were too "minor;" not because they were a mediate action.  *Id.* at 764–65 (D.C. Cir. 1997).  The court revisited the issue in *Stewart v. Evans*, where it adopted in full the Memorandum Opinion of District Court Judge Ellen Segal Huvelle with regard to the dismissal of plaintiffs Title VII claims. In so doing, the court held that under reasoning first outlined in *Taylor v. FDIC*, "the outright denial of a temporary position [such as an 'acting' position] cannot constitute an adverse employment action."  *Stewart v. Evans*, 275 F.3d 1126, 1135 (D.C. Cir. 2002) (quoting the Memorandum Opinion); *see also Brown*, 199 F.3d at 457 (denial of lateral transfer that did not affect pay or benefits insufficient to constitute adverse employment action); *Smith v. Dist. of Columbia*, 271 F.

32

Supp. 2d 165, 172 (D.D.C. 2003) (temporary reassignment without diminution in pay and benefits is not an adverse employment action).

Defendant argues that "[t]he position of 'acting branch chief' was only an intermediate step, and not placing Ms. Glenn in this role did not result in an adverse action of failure to promote." Def.'s Mot. at 35.  In her Opposition, Glenn does not directly address how the failure to make her acting branch chief was an adverse employment action.  The two generalized arguments she posits in support of her position are that (1) Howze applied for and received back pay for the time he spent as "acting" chief when he was officially made branch chief in 1999 as a result of a competitive process that occurred after her departure;[9] and (2) making Howze acting branch chief was "a significant change in *his* employment status and responsibilities."  Pls.' Opp'n at 32-33 (emphasis added). "Promotion is not a zero-sum game;" it does not follow that Glenn was harmed because Howze was advanced.  *Brown*, 199 F.3d at 459.  In light of this Circuit's previous rulings in *Stewart*, *Taylor v. FDIC*, and *Taylor v. Small*, Glenn has failed to make out a cognizable claim for sex discrimination based on failure to promote because denial of an acting position – without showing some further

---

[9] As noted, Howze became the official branch chief in 1999 following a competitive process. Howze was not paid more during the time he served as "acting" branch chief, despite his additional duties; however, Howze later obtained retroactive reimbursement for the additional duties he incurred as acting chief, but only following a complaint.  *See* Pl.'s Opp'n, Ex. 8 (Howze Dep.) at 26:15-27:7.  The parties are quite unclear how or why this reimbursement happened, or to what extent Howze was "reimbursed"; indeed, Plaintiffs are relatively silent as to the potential impact of this fact.  The Court notes that this fact, which is never flushed out in Howze's deposition, could impact its adverse action analysis.  If the acting branch chief position did legitimately provide for additional salary, then Defendant's decision to deny the position to Ms. Glenn could be viewed as an adverse action, taking it outside of the *Stewart v. Evans* category of cases.  However, given that the Court has already concluded that Ms. Glenn's claim arising out of this event is time-barred, the Court shall not proceed further down the *McDonnell Douglas* analysis to determine if (1) Defendant can proffer a legitimate, non-discriminatory reason for Plaintiff's non-selection, and if (2) Plaintiff can adduce evidence indicating discriminatory motivations underlying Defendant's apparently neutral justification.

harm – does not by itself qualify as an adverse employment action.

In sum, Glenn cannot obtain relief for her claim of gender-based discrimination against Defendant for failure to make her acting branch chief both because (1) the claim is time-barred and, even if the claim was timely, (2) Glenn failed to show how the denial was an adverse employment action.

ii.     Disparate Treatment

Glenn also advances an argument that the Department discriminated against her on the basis of sex by imposing upon her a heavier workload than that of her male colleagues. Pls.' Opp'n at 34; *id.*, Ex. 7 (Glenn Dep.), at 47:10-19. This is in essence a claim of sex discrimination based upon disparate treatment. Once again, two major problems exist with Glenn's disparate treatment/ increased workload claim such that summary judgment in favor of Defendant's on this claim is warranted.

First, Glenn's claim of sex discrimination based on an increased workload is time-barred. As above with the failure to promote claim, the discrete act that resulted in Glenn's additional workload occurred in 1994 when she was assigned to cover Wards 6, 7, and 8. At the latest, her claim can be based on the addition of Ward 5 to her workload in 1995. However, each of these instances occurred outside both the 180- and 300-day statutory periods for filing an EEOC charge. 42 U.S.C. § 2000e-5(e)(1). "[A]n untimely suit 'cannot be revived by pointing to effects within the limitations period of unlawful acts that occurred earlier.'" *Taylor v. FDIC*, 132 F.3d at 765 (quoting *Dasgupta v. Univ. of Wis. Bd. of Regents*, 121 F.3d 1138, 1140 (7th Cir. 1997)). Therefore the consequences of the alleged discriminatory action, here the increased workload between the years 1994 and 1997, cannot qualify "to toll the statute of limitation covering" the alleged discriminatory assignment of Glenn to Wards 5, 6, 7, and 8.

34

Second, even assuming *arguendo* that Glenn's disparate treatment claim based on workload was not time-barred, Glenn (1) is unable to establish the requisite *prima facie* case for such a claim, and (2) has failed to provide evidence connecting any extra work to discriminatory gender-based motivations.  In order to prove a *prima facie* case of disparate treatment, Glenn "must establish that (1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination." *Brown*, 199 F.3d at 452. "Disparate treatment occurs when 'the employer simply treats some people less favorably than others because of their race, color, sex, or national origin.'" *Anderson v. Zubieta*, 180 F.3d 329, 338 (D.C. Cir. 1999) (quoting *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n.15, 97 S. Ct. 1843, 52 L. Ed. 2d 396 (1977)).  To properly prove a claim of disparate treatment, "[p]roof of discriminatory motive is critical." *Id*.

Defendant argues that the disparity Glenn alleges in her workload as compared to her male colleagues "does not rise to the level of an adverse employment action."  Def.'s Reply at 14-15; *see also Brown*, 199 F.3d at 452 ("changes in assignments or work-related duties do not ordinarily constitute adverse employment decisions if unaccompanied by a decrease in salary or work hour changes") (quoting *Mungin v. Kattan Munchin & Zavis*, 116 F.3d 1549, 1557 (D.C. Cir. 1997)); *Crady v. Liberty Nat'l Bank & Trust Co. of Ind.*, 993 F.2d 132, 136 (7th Cir. 1993); *see also Mack v Strauss*, 134 F. Supp. 2d 103, 113-14 (D.D.C. 2001) (holding that increased workload unaccompanied by some adverse change in the terms, conditions or privileges of employment did not constitute an actionable injury); *accord Stewart*, 275 F.3d at 1135 ("Mere inconveniences and alteration of job responsibilities will not rise to the level of adverse action.") (internal citation and internal quotation marks omitted).  This argument is based, in part, on the Court of Appeals

recognition "of the judicial micromanagement of business practices that would result if we ruled otherwise." *Mungin*, 116 F.3d at 1557.  As such, it appears as though Glenn's workload claim fails because it is simply not an "adverse action" for the purposes of her *prima facie* case.

However, while the court in *Mungin* recognized the broad latitude that must be provided to employers when reviewing their decisions regarding distribution of work, it also made clear that the latitude provided is limited to instances when "the decision is not based upon unlawful criteria," thus reiterating the requirement that a discriminatory motive be proven.  *Id.* (quoting *Burdine*, 450 U.S. at 259, 101 S. Ct. at 1097).  Even moving beyond the question of "adverse action" to the issue of discriminatory motive, it is clear that Glenn lacks the requisite evidence connecting increased workload to gender-based discrimination sufficient to escape summary judgment.  Here, Glenn argues only that her workload was heavier than her male colleagues.  Pls.' Opp'n at 35.  This heavier workload, she asserts, was the result of disparate treatment between herself and her male colleagues.  However, Glenn does not show how her assignment to cover Wards 5, 6, 7, and 8 were motivated by her gender, nor that she suffered any decrease in her salary or change in work hours.

Upon a review, Glenn's deposition testimony shows that she was assigned only one ward when she first became a supervisor in 1992.  Pls.' Opp'n, Ex. 7 (Glenn Dep.), at 69:20-22.  In her Affidavit, Glenn states that she was not assigned to multiple wards – the additional "workload" – until 1994.  Pls.' Opp'n at 34; Glenn Aff. ¶ 11.[10]  Glenn advances no explanation related to her gender, in either her Affidavit or her Deposition, as to why she was assigned additional wards.

---

[10] While Glenn did not receive additional increases in pay grade between 1992 and her retirement in 1997, she also did not suffer a diminution in pay.  *Compare* Pls.' Opp'n, Ex. 42 (10/16/92 Personnel Action for Glenn effective 10/18/92) (promoting Glenn from DS 10 to DS 11) *with* Pls.' Opp'n, Ex. 28 (9/3/97 Personnel Action for Glenn effective 9/2/97) (showing Glenn's pay grade at retirement was DS 11).

Three points are in order.  First, it appears that being overworked and understaffed was the common condition for all supervisors regardless of gender, not simply Ms. Glenn.  *See* Pl.'s Opp'n, Ex. 8 (Howze Dep.) at 61:3-20 ("I don't think any unit had enough staff support.  Including Ms. Glenn's.").  Second, to the extent that some evidence indicates that Ms. Glenn did have more complaints to deal with than other supervisors, *see* Pl.'s Opp'n, Ex. 14 (McManus Dep.) at 82:20-83:11; *id.*, Ex. 8 (Howze Dep.) at 143:1-145:22 (conceding that Glenn could have been given more work, depending on how one counts carry-over complaints from year-to-year), Glenn simply has no specific evidence linking such increased workload with gender-based motivations.  *See* Pl.'s Opp'n, Ex. 14 (McManus Dep.) at 99:15-100:14.  Indeed, virtually all of her evidence on this point comes from Inspector McManus, who worked under Glenn; however, McManus himself testified in a vague and contradictory manner on this point, noting (1) that in addition to her gender, Glenn's superiors were also concerned about her intelligence level, her attention to detail and the correct procedures, and her leadership abilities, *id.* at 92:10-20, 93:21-9, 99:15-100:1, and (2) Glenn's superiors were concerned in general how a female supervisor could handle the dangerous situations arising out of the problematic wards, but – despite these gender-based concerns – decided to give Ms. Glenn responsibility for these more important and visible wards anyway, *id.* at 100:2-14, 112:4-113:19.  As such, while Glenn might have briefly had a higher workload than other supervisors, there is no direct evidence in the record linking that increase with gender-based disparate treatment as required.  Third, while Defendant conceded that Glenn "continuously complained about her workload," Def.'s Mot. at 7, Defendant was responsive to Glenn's concerns.  For instance, Glenn's complaints must have yielded results because in a supervisors' meeting in August 1997, the wards of the city were redistributed and Glenn's workload was reduced; thereafter, the wards for which Glenn was responsible included only Wards 6, 7, and 8 – Glenn was no longer responsible for Ward

5.  Pls.' Opp'n, Ex. 7 (Glenn Dep.), at 83:4.

In short, summary judgment is appropriate in favor of Defendant on Glenn's charge of gender-based discrimination in the form of disparate treatment vis-á-vis workload because (1)  her claims are time barred under 42 U.S.C. § 2000e-5(e)(1); and (2) because (a) she could not show that the additional workload was an adverse employment action, and (b) she failed to prove that her increased workload constituted disparate treatment because she did not show the act was motivated by gender-based discrimination or other impermissible motivations.

b.  *Dickens*

i.  Failure to Promote

In her Opposition, Dickens sets forth a claim of sex discrimination for "failure to promote" premised upon the Department's refusal to award her with a "career ladder promotion and other temporary and permanent promotions."  Pls.' Opp'n at 42.  As a preliminary matter, the Department's alleged failure to award Dickens a career ladder promotion is more akin to a situation where an employee is denied an increase in pay or grade, rather than a situation where an employee is denied a promotion to a vacant position.  *Cones*, 199 F.3d at 516–17.

To make out a claim of failure to promote based on a denial of increased pay or grade, as Dickens must do to prove the denial of a career ladder promotion was a form of sex discrimination, Dickens must prove

> that she belongs to a protected group, that she was qualified for and applied for a promotion, that she was considered and denied the promotion, and that other employees of similar qualifications who were not members of the protected group were indeed promoted at the time the plaintiff's request for promotion was denied.

*Bundy*, 641 F.2d at 951.  As was the case with Glenn's failure to promote claim, Dickens faces an adjustment of the *prima facie* elements established in *McDonnell Douglas* because in *McDonnell*

*Douglas*, the Court had dealt with discriminatory failure to hire, which "does not precisely apply to a claim . . . of discriminatory refusal to promote." *Id*. The *Bundy* test was "designed expressly for denials of pay or grade increases." *Cones*, 199 F.3d at 517. It is therefore this test that must be applied to Dickens' claim of denial of a career ladder promotion.

<u>First</u>, in her effort to prove a *prima facie* case of failure to promote against the Department for its refusal to award her a career ladder position, Dickens asserts (1) that she is a female; (2) that she completed the work of a DS 11/12 while detailed to the position, but was never promoted past DS 9; (3) that men in the Department did get such promotions; and (4) she requested promotions on many occasions. Pls.' Opp'n at 42. However, in order to prove a case of failure to promote under *Bundy*, Dickens must show that the men who were promoted were similarly situated to herself. Dickens plainly fails to meet this explicit requirement.

The only concrete example Dickens gives of men receiving career ladder promotions is Phil Latson, Jr. Pls.' Opp'n at 11 (noting that Latson received career ladder promotions on 6/28/92 and 3/27/93). However, Latson was not similarly situated to Dickens when Dickens was requesting a career ladder promotion. At the time, Dickens had been given a permanent position as a Dispute Resolution Specialist in the Complaint Office which is in the Office of Compliance and Complaint Division. Pls.' Opp'n, Ex. 47 (3/4/92 Personnel Action for Dickens, effective 3/8/92). Dickens' supervisors had put her name in for a career ladder promotion, however the dates of the recommendations are not provided. Dickens Aff. ¶ 28.

Dickens asserts that Latson received career ladder promotions in both 1992 and 1993. Opp'n at 11. However, the evidence upon which this assertion is based is non-existent. Plaintiffs' Exhibit 56, which contains the Personnel Actions for Latson, does indeed contain a entry for June 28, 1992, but there is no change in Latson's grade or pay contained therein. Pls.' Opp'n, Ex. 56

(6/28/92 Personnel Action for Latson) at 4.  Further, the Exhibit does not contain a Personnel Action

for March 8, 1992.  *See generally* Pls.' Opp'n, Ex. 56.  The Exhibit contains no evidence that

Latson received any promotions within the relevant time period, 1992 through 1997, career ladder

or otherwise.  The only promotion it appears Latson received became effective on January 3, 1999,

well after Dickens left the employ of the District.  Further, Latson was not an employee of the

Compliance and Complaint Division, he was a housing inspector in the Housing Regulation

Administration.  "Promotion is not a zero-sum game.  It does not follow that [Dickens] was harmed

because another employee with substantially different are of expertise . . . was advanced."  *Brown*,

199 F.3d at 459.  Therefore, even if Latson had received a career ladder promotion within the

relevant time frame, he would not have been similarly situated to Dickens, and the comparison fails.

Second, with respect to Dickens' rather vague allegation that she was refused both

temporary and permanent promotions, the *prima facie* case described above is applicable.  Upon a

review of this claim, it is evident that Dickens' allegation that she was not awarded an *unspecified*

temporary promotion must fail for lack of proof of an adverse employment action.  Dickens simply

does not elaborate on her denial of a temporary promotion claim in any detail, failing to identify the

types of temporary promotions and dates at issue.  *See, e.g.*, Pls.' Opp'n at 42-43 (at most, claiming

that Dickens established a *prima facie* case of sex discrimination "based on the Department's failure

to award Ms. Dickens . . . other temporary and permanent positions" and contending that "Ms.

Dickens, like Ms. Glenn, was denied training and denied the opportunity to act in supervisory

positions").  As the Court of Appeals stated in *Stewart*, without something *more*, "the outright

denial of a temporary position cannot constitute an adverse employment action."  *Stewart*, 275 F.3d

at 1135.  Therefore, Dickens' simple allegation that the Department denied her the opportunity to

act in a temporary supervisory position, Pls.' Opp'n at 43; Dickens Aff. ¶ 20, is insufficient;

Dickens has the burden to identify the positions at issue and explain how the denial of a temporary position or detail impacted either her salary, benefits, or promotional opportunities – a step that she has failed to take.  As such, her facial allegations fail to rise to the level of an adverse employment action.  Dickens therefore has not proven the necessary elements of a failure to promote claim based on the denial of a temporary position.

Dickens' failure to promote to permanent positions must also fail.  Dickens provides two examples of denial of a permanent position.  The first, occurred in 1989 when Dickens applied for and was rejected from a paralegal specialist position in the RHC.  Dickens Aff. ¶ 13.  The position was advertised in 1987 after Dickens had been detailed to the HID; Dickens did not apply for the position until 1989.  *Id.* at 11, 13.  Dickens applied even though one of the requirements for the position was a paralegal certificate.  *Id.* at ¶ 13.  Due to the Department's refusal to continue paying for her classes in early 1986, Dickens did not have her paralegal certificate.  *Id.*; Def.'s Mot. Ex. B, (Dickens Dep.), at 26:8–9, 11. She was not selected for the position.  Dickens Aff. ¶ 13.  The person who was selected was another woman, although a woman who Dickens asserts was less qualified than she and also lacked a paralegal certificate.  *Id.*  The facts of this denial of permanent promotion lacks two elements of the *prima facie* case: (1) Dickens was not qualified for the position and (2) the person who was selected was a person within her protected group, another woman.  Further this claim is time barred as the alleged discriminatory act occurred in 1989, well outside the statutory period required for filing EEOC charges.  42 U.S.C. § 2000e-5(e)(1).

The second example occurred while Dickens was detailed to the Assessment, Court, and Variance Branch of the HID.  While an exact date is not given, the incident would have occurred between October 1987 and August 1991.  Dickens allegedly applied for and was rejected from a position with Assessment, Court, and Variance Branch as a Coordinator.  Pls.' Opp'n at 8; Dickens

Aff. ¶ 18. The position was advertised as a DS 9. Dickens had previously been told that the position was a DS 11/12 position. Pls.' Opp'n at 8. While Dickens was not selected for the position, the position remained unfilled and was eventually cancelled. Pls.' Opp'n at 8. The facts of this incident lack one element of the *prima facie* case: while Dickens was not selected for the position, the Department did not continue to seek applicants, it simply cancelled the position. Further, as with the first example, this claim is time barred as the alleged discriminatory act occurred, at the latest in 1991, well outside the statutory period required for filing EEOC charges. 42 U.S.C. § 2000e-5(e)(1).

Dickens' claim of sex discrimination based on a failure to promote fails on all three theories. Dickens was unable to prove the elements of the *prima facie* case under *Bundy* as to the Department's failure to award her a career ladder position. Dickens' claim that she was denied temporary promotions fails to assert an adverse employment action with any specificity or harm shown, and therefore must also fail. Finally, Dickens has failed to establish a *prima facie* case that (1) she was denied a permanent promotion with RHC, because she was not qualified for the position she applied for and the person who was selected was a member of her protected group, and (2) she was unlawfully denied a permanent position in the Assessment, Court and Variance Branch, because the position she applied for remained vacant and was eventually cancelled without additional applicants being sought, and therefore was not awarded to an employee of similar qualifications outside of Dickens' protected group (women). Further, both claims of denial of permanent promotions must fail because they are untimely.

### ii.    *Disparate Treatment*

Dickens' claim of disparate treatment rests upon the "Department's discriminatory use of detail assignments," the rapid advancement of men as compared to women, and the unequal training

opportunities provided to women.  Pls.' Opp'n at 41.  The *prima facie* case for disparate treatment

requires Dickens to "establish that (1) she is a member of a protected class; (2) she suffered an

adverse employment action; and (3) the unfavorable action gives rise to an inference of

discrimination."  *Brown*, 199 F.3d at 452; *cf. Stella v. Mineta*, 284 F.3d 135, 145 (D.C. Cir. 2002);

*Charles v. Nat'l Rehab. Hosp.*, Civ. No. 94-0171, 1994 WL 874211, at *5 (D.D.C. Sept. 29,

1994); *Childers v. Slater*, 44 F. Supp. 2d 8, 18 (D.D.C. 2000), *vacated in part on other grounds*,

197 F.R.D. 185, 191 (D.D.C. 2000).  "Disparate treatment occurs when 'the employer simply treats

some people less favorably than others because of their race, color, sex, or national origin.'"

*Anderson*, 180 F.3d at 338 (quoting *Int'l Bhd. of Teamsters*, 431 U.S. at 335 n.15, 97 S. Ct.

1843).  To properly prove a claim of disparate treatment, "[p]roof of discriminatory motive is

critical."  *Id.*

  Dickens' claim of disparate treatment revolves almost exclusively around her lengthy detail

to the HID Assessment, Court, and Variance Branch between 1987 and 1991 in which she had no

job description; she was apparently tasked, cryptically, with unassembled duties.  Pls.' Opp'n, Ex.

38 (Request for Personnel Action for Dickens) (assigning her to unassembled duties within the

Assessment, Court, and Variance Branch); *id.*, Ex. 41 (8/11/91 Personnel Action for Dickens)

(assigning her to be a contact representative within the Office of Compliance and Complaint

Division within the Department).  While in this lengthy detail, Dickens continued to be paid at DS 8

level although she was performing tasks for which another employee, a male, was being paid at DS

11.  Pls.' Opp'n at 8.  Dickens argues that (1) in general women were detailed for longer periods

than men; (2) that men were detailed into positions that "groomed them for future promotions"; (3)

that men were promoted into the positions to which they were detailed; and (4) she, unlike her male

counterparts, was never allowed to act in higher level positions.  Pls.' Opp'n at 41.

Dickens claim of disparate treatment based upon the Department's detailing practices is time-barred. As Dickens' detail began in 1987 and ended in 1991, the time for bringing an action claiming sex discrimination in detailing is long since passed. While she asserts the argument in the context of the Department discriminating against all women in this manner, the evidence she proffered relates solely to her own detail to the HID in 1987, ending in 1991. The discrete discriminatory act occurred at the earliest in 1987 when she was detailed, and at the latest in 1991, prior to her reassignment to contact representative. Any and all types of disparate treatment she claims to have suffered in relation to her detail occurred within that time frame. Therefore, Dickens' claim of gender-based disparate treatment discrimination fails under the applicable statute of limitations, and summary judgment is granted to Defendant with respect to Dickens claim of gender-based disparate treatment in Count I of the Second Amended Complaint.

### 2.    Retaliation (Count II)

To establish a *prima facie* case of retaliation, Plaintiffs must show that (1) they engaged in statutorily protected activity; (2) the Department took an adverse personnel action; and (3) that a causal connection existed between the two. *See Jones v. Washington Metro Area Transit Auth.*, 205 F.3d 428, 433 (D.C. Cir. 2000); *Morgan*, 328 F.3d at 651; *Holbrook v. Reno*, 196 F.3d 255, 263 (D.C. Cir. 1999).

To establish an adverse employment action in the absence of a diminution in pay or benefits, Plaintiff must show an action with "materially adverse consequences affecting the terms, conditions, or privileges of employment." *Brown*, 199 F.3d at 457. The employment decision must inflict "objectively tangible harm." *Russell v. Principi*, 257 F.3d 815, 818 (D.C. Cir. 2001) (recognizing that this requirement "guards against both judicial micromanagement of business practices, and frivolous suits over insignificant slights") (internal quotation omitted). "An employment decision

does not rise to the level of an actionable adverse action . . . unless there is a tangible change in the duties or working conditions constituting a material employment disadvantage." *Stewart*, 275 F.3d at 1134 (D.C. Cir. 2002); *see also Russell*, 257 F.3d at 818 ("[N]ot everything that makes an employee unhappy is an actionable adverse action.  Minor and even trivial employment actions that an irritable, chip-on-the-shoulder employee did not like would otherwise form the basis of a discrimination suit.") (citations and internal quotation omitted); *Brown*, 199 F.3d at 457 ("Mere idiosyncrasies of personal preference are not sufficient to create an injury.").  As noted previously, "[a] tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Ellerth*, 524 U.S. at 761, 118 S. Ct. 2257.  However, an employer's criticism of an employee's work does not generate a tangible employment action.  *See, e.g.*, *Weigert v. Georgetown Univ.*, 120 F. Supp. 2d 1, 17 (D.D.C. 2000) ("Formal criticism and poor performance evaluations do not ordinarily constitute adverse actions."); *Brodetski v. Duffey*, 141 F. Supp. 2d 35, 43 (D.D.C. 2001) ("Criticism of an employee's performance unaccompanied by a change in position or status does not constitute adverse employment action.").

To prove the required third element, i.e., a causal connection, Plaintiff must make a "showing that the employer had knowledge of the employee's protected activity, and that the adverse personnel action took place shortly after that activity." *Mitchell*, 759 F.2d at 86; *see also Grant v. Bethlehem Steel Corp.*, 622 F.2d 43, 46 (2d Cir. 1980) ("[C]ourts have recognized that proof of causal connection can be established indirectly by showing that discriminatory activity is followed by discriminatory treatment.").

Importantly, "[t]he cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima face case uniformly hold that the temporal proximity must be 'very close.'"  *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) ("Action taken (as here) 20 months later suggests, by itself, no causality at all.").  Courts have generally accepted time periods of a few days up to a few months, and have seldom accepted time lapses outside of a year in length.  *See Brodetski*, 141 F. Supp. 2d at 43.  The District Court for the District of Columbia has held that a matter of weeks, and of three to five months is a short enough time lapse between the protected activity and the alleged retaliatory conduct to establish a causal connection.  *See, e.g.*, *Goos v. Nat'l Ass'n of Realtors*, 715 F. Supp. 2, 3-4 (D.D.C. 1989) (holding that five weeks constituted a short enough time lapse to establish a causal connection); *Castle v. Bentsen*, 867 F. Supp. 1, 3 (D.D.C. 1994) (holding that three to five months is a short enough time lapse between EEO activity and reprisal to establish a causal connection), *aff'd*, 78 F.3d 654 (D.C. Cir. 1996).

However, courts within this Circuit have also found that time lapses of greater length negate any inference that a causal connection exists between the protected activity and the complained-of action.  *See, e.g.*, *MECO Corp. v. Nat'l Labor Relations Bd.*, 986 F.2d 1434, 1437 (D.C. Cir. 1993) (citing various cases noting that gaps of four-to-eight months were insufficient to support an inference of causation in a similar setting); *Devera v. Adams*, 874 F. Supp. 17, 21 (D.D.C. 1995) (holding that "an eight month interval between the two events is not strongly suggestive of a causal link"), *aff'd*, 1997 WL 404898 (D.C. Cir. June 5, 1997); *Sullivan-Obst v. Powell*, 300 F. Supp. 2d 85, 92-93 (D.D.C. 2004) (lapses of over three months and over fifteen months were insufficient to support an inference of causation); *Garrett v. Lujan*, 799 F. Supp. 198, 202 (D.D.C. 1992) (holding

that almost a year "between plaintiff's EEO activity and the adverse employment decision is too great [a length of time] to support an inference of reprisal"); *Townsend v. Washington Metro Airport Auth.*, 746 F. Supp. 178, 187 (D.D.C. 1990) (two year gap insufficient to create inference); *Forman*, 271 F.3d at 301 (three year lapse insufficient to support inference of causation). Courts within other jurisdictions have held that similar lapses in time are not actionable. *See, e.g.*, *Richmond v. Oneok, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997) (three month lapse, standing alone, is insufficient to establish causation); *Hughes v. Derwinski*, 967 F.2d 1168, 1174-75 (7th Cir. 1992) (lapse of four months, by itself, is insufficient). Accordingly, the greater the time that has elapsed between the protected activity and the alleged acts of discrimination, the more difficult it is for a complainant to justify an inference of causal connection between the two. *See Saunders v. DiMario*, Civ. No. 97-1002, 1998 WL 525798, at *5 (D.D.C. Aug. 14, 1998).

Both Glenn and Dickens assert claims of retaliation, and for the reasons set forth below, summary judgment will be granted to Defendant in regards to both Plaintiffs on this Count.

> a.  Glenn

In order to prove a *prima facie* case of retaliation, Glenn alleges first that she engaged in statutorily protected activity (1) in 1989, when she filed an EEOC complaint; (2) in 1991, when she joined the class action lawsuit filed by Plaintiff Dickens alleging harassment and sex discrimination against the Department; and (3) in 1994, when she again filed an EEOC complaint against the Department alleging sex discrimination and retaliation. Pls.' Opp'n at 45. Second Glenn states that she suffered numerous adverse employment actions. *Id.* In support of this statement, Glenn refers this Court to a portion of her Opposition that argues she was the victim of hostile work environment. *Id.* (referring the court to Pls.' Opp'n at 26 for a list of the adverse employment actions she

47

suffered).  The actions listed therein, allege that she was (1) threatened with termination; (2)

assigned more work and less support staff than her male colleagues beginning in 1990; (3)

continuously singled out for reprobation; (4) subjected to sexually explicit language regarding

women; (5) denied equal access to her supervisors; (6) denied training opportunities; (7) ignored

when it came to work-related inquiries; and (8) given a lower evaluation in 1996 than she deserved.

*Id*. at 26–27.  Finally, Glenn asserts that there is a causal connection based on a pattern of

antagonism and retaliation between 1991 and 1997.  *Id*. at 45.

Defendant makes two arguments against Glenn's claim of retaliation.  First, Defendant

argues that Glenn has not alleged any retaliatory acts occurring within the 300-day statutory period

for filing an EEOC claim.  Def.'s Reply at 16.  Second, Defendant argues that allegedly retaliatory

acts are not causally related to Glenn's protected statutory actions.  *Id*.  The Court agrees with

Defendant on its second argument and for that reason, summary judgment will be granted to

Defendant regarding Glenn's retaliation claim.

As stated above, a time lapse of greater than five months between the alleged retaliatory

action and the employees protected statutory activity has not been accepted within this Circuit as

sufficiently temporally proximate.  *See Castle*, 867 F. Supp. at 3 (finding sufficient temporal

proximity in a three to five month gap); *MECO Corp.*, 986 F.2d at 1437 (citing cases that held that

lapses of four to eight months were insufficient to prove a causal connection).  This Circuit has

certainly not been accepting of lapses of greater than three years.  *See Forman*, 271 F.3d at 301

(finding three year lapse insufficient to support inference of causation).  Here, the last protected

activity Glenn engaged in was in 1994 when she filed an EEOC complaint against the Department

when it elevated Howze to acting branch chief rather than herself.  Glenn did not file another EEOC

complaint until January 21, 1998, more than three years after her last alleged protected action.  To

be actionable, the retaliation Glenn suffered should have occurred – at most – somewhere between three to five months after she filed the 1994 EEOC complaint.  As she provides the Court with no concrete dates upon which any of the alleged retaliatory actions occurred, it is impossible to determine this.  Further, in order to be timely, the alleged retaliatory acts would have had to occur within the 180- or 300-day statutory period preceding the 1998 EEOC complaint.  In order to be within the 180-day period, the actions would have had to occur after July 30 1997, and to be within the 300-day statutory period the actions would have had to occur after April 1, 1997.  Only one of the above alleged adverse employment actions can be verified by the evidence to have occurred within that time period, namely Aldridge's threat to fire Glenn in August 1997.  This action, however, is too remote from the 1994 EEOC charge to be actionable as retaliation.

Glenn argues that temporal proximity is not the sole way in which to establish a causal connection.  Pls.' Opp'n at 45.  Glenn argues that additional facts, in particular "the pattern of antagonism and retaliation against" her that "worsened whenever she engaged in another protected activity" should establish the causal connections.  *Id*.  While Judge Reggie B. Walton of this Court has indeed found a causal connection between alleged retaliatory conduct and protected activity when time lapse exceeded the three to five month window, the case is distinguishable.

In *Buggs v. Powell*, Judge Walton determined that the seven month lapse between the plaintiff's filing of an EEOC complaint and his non-selection for a promotion, was not "*by itself* sufficient to establish an inference of discrimination." *Buggs*, 293 F. Supp. 2d at 149.  However, Judge Walton emphasized there were substantial facts that indicated plaintiff's non-selection was due to the EEOC complaint he had filed.  Of particular note, the person who made the selection for the position plaintiff sought was the person being investigated by the EEOC based on the plaintiff's earlier EEOC charge.  That the person in charge of filling the position was the target of plaintiff's

EEOC complaint provided "an inference of retaliatory discrimination . . . even though its proximity to the protected activity would not alone support such an inference." *Id.*

In this case, Glenn provides this Court with no such similar or otherwise compelling evidence that would overcome the lack of temporal proximity. In addition, the plaintiff in *Buggs* faced only a seven month lapse between EEO activity and alleged retaliation, not a lapse of greater than three years, as exists here. As stated above, as the time between the protected activity and the retaliatory act grow more distant, the complainant will have a harder time proving a causal connection. *See Saunders*, 1998 WL 525798, at * 5. The Court does not find *Buggs* rationale applicable in this case vis-á-vis Glenn as the facts – or lack thereof – are simply too disparate. Due to the remoteness of the last documented protected activity by Glenn and the current EEOC charge, the Court finds that a casual connection is lacking. Accordingly, the Court shall grant summary judgment for the Defendant with respect to Glenn's retaliation claim.

> b.    *Dickens*

In establishing her *prima facie* case of retaliation, Dickens first notes that she engaged in statutorily protected activity (1) in 1976, when she filed a Title VII complaint alleging discrimination against the Department, Dickens Aff. ¶ 4; (2) in 1978, when she filed a Title VII sex discrimination and equal pay complaint, *id..*; (3) in 1983,[11] when she filed a Title VII suit following her termination from the Department in 1981, *id.*; Pls.' Opp'n, Ex. 36 (Consent Decree) (docket no. 83-2099); (4) in 1984, when she filed an administrative EEO complaint because she was not given the same pay raises as her colleagues were given while she had been terminated from Department

---

[11]    The Opposition states that Dickens filed suit in 1981 for her firing in 1981, however the evidence does not support that. The Consent Decree that was signed Nov. 15, 1985 has the civil action docket number 83-2099, which indicates that the suit was filed in 1983, not 1981. Pls.' Opp'n, Ex. 36 (Consent Decree).

following her reinstatement to the Department, Pls.' Opp'n at 6, 46; (5) in 1987, 1988, 1989 when

she filed EEOC complaints, Pls.' Opp'n at 46; (6) in 1991 when she filed a class action lawsuit

against the Department for sex discrimination, *id.*; (7) in 1995 when she filed an EEOC complaint

alleging sex discrimination, *id.*; and (8) in 1996 when she filed an administrative complaint against

the Department for sex discrimination, *id.* In addition, she notes that between 1984 and 1997 she

filed administrative complaints and in 1998 she filed the EEOC charge that is the basis of this

action. *Id.*

Dickens then asserts that the Department took "numerous" adverse employment actions

against her. *Id.* As with Glenn, Dickens directs this court to a list of actions set forth in her

argument establishing a hostile work environment. *Id.* The list contains twenty-eight alleged

retaliatory acts. *Id.* at 27-29. Dickens claims that there is a causal connection between these actions

and her statutorily protected activities because there is evidence of a pattern of antagonism and

retaliation. *Id.* at 46.

Defendant argues that Dickens has not established a cognizable claim of retaliation

occurring within the 180- or 300-day statutory period. Inherent in the *prima facie* case requirement,

Dickens must prove that each act was an adverse employment action. The actions pertaining to her

details between 1987 and 1991, Pls.' Opp'n at 27–29, ¶¶ 3, 4, 6, 7, 10, 11, 14(a), and 14(b)[12] have

been dealt with above as flatly untimely. *See* Part III.C.1.b.ii. As have the actions relating to the

denial of promotions, which were also determined not to meet the *prima facie* elements for

discriminatory failure to promote, Pls.' Opp'n at 27–29, ¶¶ 2, 4, 9, 17, 18, 24. *See* Part III.C.1.b.ii.

The action relating to the violation of the Consent Decree was resolved in Part III.C.1. as outside the

---

[12] The paragraphs setting forth the alleged adverse employment actions Dickens suffered are misnumbered and included two Paragraphs 14. The Court refers to them as ¶ 14(a) and ¶ 14(b).

statute of limitations.  Pls.' Opp'n ¶ 19.  The remaining fourteen acts will be dealt with below.

Each discrete act of retaliation Dickens cites must be an adverse employment action in itself.

In addition, each must have a causal connection to Dickens' protected activity.  Paragraphs 8 and 27

refer to Dickens being assigned to the front of the office after she had complained that she had been

unfairly denied leave.  Dickens Aff. ¶ 19.  This occurred sometime after her non-selection for the

Assessment, Court, and Variance Branch Coordinator position while detailed to the Assessment,

Court and Variance Branch between 1987 and 1991.  *Id.*  Glenn however neither indicates what this

action was in retaliation for, nor when the date of the action occurred, nor even how this was an

adverse employment action.  Her pay did not decrease as a result of the move to the front of the

office, and changes in duties without something more, like a pay decrease, does not qualify as an

adverse employment action.  *Brown*, 199 F.3d at 452.  Dickens move to the front of the office was

not an adverse employment action and cannot therefore be an actionable act of retaliation.

Paragraphs 13, 15, and 16 relate to Dickens assignment to the Office of Compliance in

1991.  Pls.' Opp'n at 28, ¶¶ 13, 15, 16.  Dickens assignment out of the detail in HID was to the

position (contact representative) and pay grade (DS 8) that Dickens was at before her detail in 1987.

Dickens claims this reassignment was in retaliation for her filing the class action Title VII lawsuit

against the Department in 1991.  *Id.* at ¶ 13.  Further, Dickens claims the paperwork related to her

reassignment falsely stated that she was being transferred from the RHC rather than HID, where she

had been detailed for the past three years, and that the Director signed off on this allegedly false

paperwork.  *Id.* at ¶ 15.  Dickens gives no indication of how paperwork misrepresenting from which

subdivision she was being transferred constitutes an adverse employment action.  In addition, the

alleged retaliatory act, her assignment to the Office of Compliance occurred in 1991, well outside

the statutory period for filing EEOC charges.  42 U.S.C. § 2000e-5(e)(1).

Paragraphs 1 and 26 are related in that they deal with reprimands and evaluations of Dickens.  Pls.' Opp'n at 27, 29.  Dickens claims she was written up for minor infractions for which her male counterparts were not written up.  Opp'n at 27, ¶ 1.  In addition, she claims she was given a lower performance evaluation than she deserved.  *Id.* at 29, ¶ 26.  In *Brown v. Brody*, the court refused to accept the argument that "formal criticism or poor performance evaluations are necessarily adverse actions."  *Brown*, 199 F.3d at 458.  This was based in part on the fact that the plaintiff in Brown suffered neither a change in grade nor salary as a result of receiving a "fully satisfactory" performance evaluation.  *Id.*  Here, where the formal write-ups and the Satisfactory performance evaluation did not affect her pay or grade at the time, neither can be considered an adverse employment action.  *Accord Brown*, 199 F.3d at 458 (holding that a performance evaluation, negative or otherwise, is not an adverse action unless it affects the employee's grade or salary).  As such, neither can be an actionable basis of a retaliation claim.

Paragraphs 12, 20, 21, and 22 suffer a similar fate to many of the preceding paragraphs: they do not indicate that an adverse employment action occurred.  Paragraph 12 refers to the attempt by management to transfer Dickens to a clerical position, which would have been a demotion.  Pls.' Opp'n at 28, ¶ 12.  However, the transfer never occurred.  Dickens suffered no adverse action as a result of the attempt.  In Paragraphs 20 and 21 she states that she lost her right to flex time in 1997 and was falsely accused of reporting leave abuses.  Again, Dickens did not suffer any tangible harm from those actions.  Her pay did not change, nor did anything else as a result.  First, with respect to her flex time claim, it is clear that in the absence of any particular vulnerability on the part of a plaintiff, the denial of flex time or changes in the normal work schedule will not constitute an adverse action.  *See, e.g.*, *Washington v. Ill. Dep't of Revenue*, 420 F.3d 658, 661-62 (7th Cir. 2005) ("Such changes may cause upset as workers must adjust their schedules but do not hurt the

pocketbook . . . . [They] normally are not 'adverse actions.'") (finding that denial of a flex time request "would not be materially adverse for a normal employee," but was for this particular employee given the fact that her son had Down syndrome and required attention); *Rivera v. Potter*, Civ. No. 03-1991, 2005 236490, at *6 (S.D.N.Y. Jan. 31, 2005) ("Plaintiff's subjective opinion about his working schedule at any given point during his employment . . . does not qualify as an adverse employment action.") (finding that a "disagreeable function" in a plaintiff's work schedule is insufficient to establish an adverse employment action); *Donahoo v. Master Data Ctr.*, 282 F. Supp. 2d 540, 550 n.3 (E.D. Mich. 2003) ("working fixed hours instead of flex-time" is insufficient to constitute an adverse action). Here, Ms. Dickens has neither alleged nor established any particular vulnerability; as such, the fact that she believed that the denial of flex time was "disagreeable" is simply insufficient to establish an adverse employment action.

Second, with respect to Dickens' "false accusation" claim, it has long been held that an accusation of possible misconduct without more is simply not "a tangible employment action constitut[ing] a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits," and therefore cannot be an adverse personnel action. *Burlington Indus.*, U.S. at 761, 118 S. Ct. 2257; *see also Forkkio v. Powell*, 306 F. 3d 1127, 1131 (D.C. Cir. 2002); *Brown*, 199 F.3d at 457; *see also Velikonja v. Mueller*, 315 F. Supp. 2d 66, 75 (D.D.C. 2004) ("Actions imposing purely subjective harms, such as dissatisfaction or humiliation, are not adverse . . . . [a] mere investigation into an employee's conduct that does not lead to disciplinary action is not an actionable adverse employment action."); *Mack v. Strauss*, 134 F. Supp. 2d 103, 114 (D.D.C. 2001), *aff'd*, 2001 WL 1286263 (D.C. Cir. Sept. 28, 2001) ("mere investigations by plaintiff's employer cannot constitute an adverse action because they have no adverse effect on plaintiff's

54

employment"); *Moore v. Summers*, 113 F. Supp. 2d 5, 23 (D.D.C. 2003) ("It is undisputed that no

disciplinary action has been taken . . . as a result of the investigation.  Consequently, there was no

adverse action.") (citing *Yerdon v. Henry*, 91 F.3d 370, 378 (2d Cir. 1996)).  In Paragraph 22 she

states that she was labeled a complainer and that people had perceived her as filing a lot of

grievances.  This statement is not necessarily untrue, as Dickens did file numerous grievances,

EEOC complaints, and Title VII lawsuits.  While it may be said that Dickens cannot be wrongfully

harmed by the truth, it may definitely be said that she suffered no adverse consequences because of

those statements.  *See Stewart* 275 F.3d at 1136 (holding that public humiliation or loss of

reputation -- without other adverse consequences -- do not constitute adverse employment actions

under Title VII).

    In Paragraph 25, Dickens claims that management encouraged staff managers and

employees of RHC and HID to harass her.  Pls.' Opp'n at 29, ¶ 25.  Assuming this is true, Dickens

technically left the employment of RHC when she was detailed to HID in 1987, and she left the

employment of HID in 1991 when she was reassigned to the Office of Compliance.  The retaliatory

act in this instance would be management's encouragement to her managers and co-workers to

harass her.  To be actionable in this lawsuit, the encouragement must have occurred within the 180-

or 300-day statutory period.  However, Dickens was reassigned to the Office of Compliance in

1991, and out of the RHC and HID.  Any encouragement of harassment on the part of management

while Dickens was employed in RHC or HID is therefore time-barred.

    This Court grants Defendant's Motion for Summary Judgment as to Dickens retaliation

claim because each incident of alleged retaliation is either time-barred under 42 U.S.C. § 2000e-

5(e)(1), or because either the requisite causal connection is lacking or the action was simply not

adverse.  Accordingly, as this Court also granted summary judgment as to Glenn's claim of

retaliation, summary judgment is granted in favor of Defendant as to the entirety of Count II of

Plaintiffs' Second Amended Complaint.

            3.    <u>Continuing Violation</u>

      While the Court has found that Plaintiffs' claims fail based in large part because they are

untimely or do not constitute an adverse employment action, Plaintiffs attempt to save Counts I and

II by asserting the discrimination and retaliation they suffered was a continuing violation.  Pls.'

Opp'n at 21.  A continuing violation exists "[w]here the discriminatory practice is continuing in

nature."  *Gary v. Washington Metro. Area Transit Auth.*, 886 F. Supp. 78, 89 (D.D.C. 1995).

However, "discrete discriminatory acts are not actionable if time barred, even when they are related

to acts alleged in timely filed charges."  *Morgan*, 536 U.S. at 113, 122 S. Ct. at 2072.  In addition,

"[e]ach incident of discrimination and each retaliatory adverse employment decision constitutes a

separate actionable 'unlawful employment practice.'  [Plaintiffs] can only file a charge to cover

discrete acts"—such as "termination, failure to promote, denial of transfer, or refusal to hire"—"that

'occurred' within the appropriate time period."  *Id.* at 114, 122 S. Ct. at 2073.  In cases of

continuing discriminatory violations, "the required time periods for filing administrative complaints

should run 'from the last occurrence of the discrimination and not from the first occurrence.'"  *Gary*,

886 F. Supp. at 89 (citing 118 Cong. Rec. 7167 (1972) (conference report)).  In order to adequately

allege a continuing violation, the plaintiff "must show that at least one adverse employment action

occurred within the [limitations] period" that was related to the claims falling outside the filing

period.  *Id.*; *see also Schrader v. Tomlinson*, 311 F. Supp. 2d 21, 27 (D.D.C. 2004) (same).

"Specific, unrelated incidents of discrimination do not constitute a continuing violation."  *Gary*, 886

F. Supp. at 89.  "Moreover, the District of Columbia Circuit has clearly held that a plaintiff may not

rely on the continuing violation theory where [he] was aware of the discriminatory conduct at the

time it occurred." *Schrader*, 311 F. Supp. 2d at 27 (citing *Taylor v. FDIC*, 132 F.3d at 765).  As

the D.C. Circuit explained, "[f]or statute of limitations purposes, a continuing violation is 'one that

could not reasonably have been expected to be made the subject of a lawsuit when it first occurred

because its character as a violation did not become clear until it was repeated during the limitation

period[.]'" *Taylor v. FDIC*, 132 F.3d at 765 (citation omitted); *see also Albritton v. Kantor*, 944

F. Supp. 966, 971 (D.D.C. 1996) ("[i]f the employee could not perceive discrimination until a series

of acts occurred, then the employee should be able to plead the earlier, [otherwise] time-barred

claim") (citations omitted).  Plaintiffs continuing violation theory fails for two reasons.  First, no

actionable discriminatory or retaliatory act occurred within the statutory period.  Second, Plaintiffs

were both aware of the alleged discriminatory or retaliatory conduct that occurred outside the

statutory period long before this EEOC complaint was filed in January 1998.  In the interest of

efficiency, as Plaintiffs claims of retaliation and discrimination have already been analyzed above,

there is no need to do so again.  See Parts III.C.1 and III.C.2.  The Court will address the Plaintiffs'

knowledge of the alleged discriminatory and retaliatory conduct occurring outside the statutory

period below.

Both Glenn and Dickens filed numerous EEOC complaints, administrative complaints, and

Title VII actions against the Department over the course of their respective employments.  Their

exercise of their statutory rights were based on alleged discrimination in the form of failure to

promote, additional workload, unlawful details, and on alleged retaliation.  That Plaintiffs were so

familiar with their statutory rights and took advantage of them when they perceived they were being

violated indicates that Plaintiffs were aware that the Department's conduct could be construed as

discriminatory and retaliatory.

Glenn testified at her deposition that she was aware that she was being discriminated against when she first became a supervisor because her workload was much heavier than that of her male colleagues. Pls.' Opp'n, Ex. 7 (Glenn Dep.), at 47:10–14. In addition, Glenn testified that she had regularly complained about unfair treatment. *Id.* at 56:18. In 1994, following Howze's detail to acting branch chief, Glenn filed an EEOC complaint alleging sex discrimination and retaliation. Pls.' Opp'n at 4. To assert that Glenn was unaware that the Department's conduct was retaliatory and discriminatory would be disingenuous.

Dickens testified that she knew her detail to HID in 1987 was objectionable after 90 days had elapsed. Pls.' Opp'n, Ex. 6 (Dickens Dep.), at 56:15–17. Further, Dickens testified that she objected to her October 1987 detail to HID both "administratively and via the EEOC." *Id.* at 59:20. Over the course of her employment with the Department, Dickens filed at least eight EEOC complaints or Title VII lawsuits, in addition to numerous administrative complaints. As with Glenn, it is inconceivable that Dickens was not aware that the Department's alleged conduct could be construed as discriminatory or retaliatory when it occurred.

Plaintiffs' attempt to salvage Counts I and II through the use of the continuing violation theory must fail both (1) because there was no adverse employment action, either discriminatory or retaliatory, within the statutory period, and (2) also because Plaintiffs were both well aware that the acts falling outside the statutory period occurred and that they could be considered discriminatory or retaliatory – as is evidenced by their deposition testimony and the plethora of EEOC complaints, administrative complaints, and Title VII lawsuits that were filed over the course of their employment. Therefore, Defendant's Motion for Summary Judgment as to Counts I and II is granted.

4.      Hostile Work Environment

Title VII makes it unlawful for an employer to "discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). "Terms, conditions, or privileges" encompass tangible as well as psychological harm. *See Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 64, 106 S. Ct. 2399, 91 L. Ed. 2d 49 (1986). In addition, the Supreme Court has held that "[w]hen the workplace is permeated with discriminatory intimidation, ridicule and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22, 114 S. Ct.367, 126 L. Ed. 2d 295 (1993) (quotation omitted). The unlawful employment practice contemplated by a claim of hostile work environment "cannot be said to occur on any particular day. It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own." *Morgan*, 536 U.S. at 115.

To establish a claim of a hostile work environment, a plaintiff must demonstrate: (1) she is a member of a protected class; (2) she was subjected to unwelcome harassment; (3) the harassment occurred because of the plaintiff's protected status; (4) the harassment affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment in question but nonetheless failed to either take steps to prevent it or afford the plaintiff prompt remedial action. *See Baloch v. Norton*, 355 F. Supp. 2d 246, 259 (D.D.C. 2005) (citing cases); *Gustave-Schmidt v. Chao*, 360 F. Supp. 2d 105, 120 (D.D.C. 2004) (citing cases). In determining whether a hostile work environment exists, the Supreme Court has directed the courts to look at the totality of the circumstances, including "'the frequency of the discriminatory conduct; its severity;

59

whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787–88, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998) (quoting *Harris*, 510 U.S. at 23). While the plaintiff is not required to plead a *prima facie* case of hostile work environment in the complaint, the alleged facts must be able to support such a claim. *See Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1114 (D.C. Cir. 2000). In addition, the Supreme Court has circumscribed the definition of a hostile work environment so that "[t]hese standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a 'general civility code.'" *Faragher*, 524 U.S. at 788, 118 S. Ct. 2275 (citations omitted). Indeed, these standards are intended to "filter out complaints attacking 'the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing.'" *Id.* (citations omitted). "Even a few isolated incidents of offensive conduct do not amount to actionable harassment." *Stewart*, 275 F.3d at 1134 (citing *Hopkins v. Baltimore Gas & Elec. Co.*, 77 F.3d 745, 753 (4th Cir. 1996) ("holding that the fact that alleged incidents were spread over a seven-year period suggested that the harassment was not sufficiently pervasive to establish [] Title VII liability"); *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir. 1995) ("holding that nine incidents spread over seven months did not constitute sexual harassment because the supervisor never touched the employee and incidents were not sufficiently severe or pervasive")).

Finally, in order for a claim of hostile work environment to be timely, the plaintiff need only file an EEOC complaint within the statutory period "of any act that is part of the hostile work environment." *Morgan*, 536 U.S. at 117. "Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a

court to determine liability." *Id.* However, the Supreme Court restricted the extent to which acts

occurring within the filing period can save those occurring outside the statutory period:

> [I]f an act [within the filing period] had no relation to the acts [outside the filing period],
> or for some other reason, such as certain intervening action by the employer, was no
> longer part of the same hostile environment claim, then the employee cannot recover for
> the previous acts, at least not by reference to the [latter] day . . . act.

*Id.* at 118.

> a.    Glenn

In establishing her *prima facie* case, Glenn asserts that as a woman she is a member of a

protected class, and because of her sex she was subjected to unwelcome harassment in the form of

(1) being threatened with termination; (2) having a heavier workload than her male colleagues; (3)

being "continuously" singled out and ridiculed in front of her staff regarding her failure to complete

her work assignments; (4) being subjected to sexually explicit language regarding women; (5) being

denied access to her supervisors; (6) being denied training opportunities; (7) having her work-related

inquiries ignored; and (8) being given a lower evaluation in 1996 than she deserved by Howze.

Pls.' Opp'n at 26–27; Def.'s Mot. at 9.  Glenn claims that this harassment was due to her gender

and concludes that this conduct constituted a single unlawful employment practice.  Pls.' Opp'n at

26.  Finally, Glenn asserts that the Department knew of the conduct and encouraged and condoned

the conduct.  *Id.* at 30.  Glenn also asserts that the hostile work environment she was subjected to

was in retaliation for her participation in protected activity.  *Id.* at 26.

Defendant argues that Glenn's claim of discriminatory hostile work environment must fail

because the conduct Glenn cites is not "severe enough to create a hostile work environment."  Def.'s

Reply at 9; *see also Bryant v. Brownlee*, 165 F. Supp. 2d 52, 63 n.9 (D.D.C. 2003) (claims of

discriminatory hostile work environment and retaliatory hostile work environment require the

existence of "severe or pervasive harassing conduct").

The only conduct of the eight listed above that definitively occurred within the filing period was Glenn being threatened with termination.  This threat occurred in August 1997, at a supervisors meeting, and was in response to Glenn's complaints of having too much work.  James Aldridge, the person who called the meeting and who allegedly made the threat, stated that "if you can't perform your duties then you can be . . . fired at will."  Pls.' Opp'n Ex. 7, Glenn Dep. 82:4–5.  This complaint is very similar to Glenn's complaint of being singled out by her supervisors for not completing her work assignments.  Both of these complaints can "be characterized as 'ordinary tribulations of the workplace' that are not actionable."  *Bryant*, 265 F. Supp. 2d at 69 (quoting *Faragher*, 524 U.S. at 788, 118 S. Ct. at 2284).  The court in *Bryant* found such instances to be "too mild and too common in many workplaces to constitute 'an abusive working environment' that provides a basis for a Title VII claim."  *Id.*  So too does this Court find, and as a result, Glenn's claim of hostile work environment must fail because the evidence does not support the occurrence of any of the other actionable conduct within the filing period.  As there is no valid "act" falling within the filing period to substantiate Glenn's hostile work environment claim, which would then allow a consideration of the other acts outside of the filing period, the entire claim must fail.  Summary judgment is therefore granted to Defendant on Glenn's claim of discriminatory hostile work environment and retaliatory hostile work environment.

> b.     *Dickens*

In establishing her *prima facie* case, Dickens claims that as a woman she is a member of a protected class.  She then lists twenty-eight examples of the unwanted harassment she suffered allegedly because of her gender.  The examples of harassment Dickens provides are that she was: (1) written up while working at the RHC; (2) passed over for training and promotions; (3) unlawfully

reassigned to the Office of Compliance; (4) unlawfully passed over for promotions in the HID; (5)

unlawfully and retaliatorily reassigned to the Office in Compliance following her 1991 Title VII

class action lawsuit (6) listed in the realignment package in which all other housing inspection staff

was promoted except her; (7) refused back pay for detailed assignments; (8) relegated to the front of

the office after complaining about her status; (9) refused a promotion in 1991; (10) on detail when

her regular position was abolished; (11) received a negative evaluation while on detail for her

normal position which had been abolished; (12) subjected to management's attempt to demote her to

a clerical position in 1991; (13) reassigned to the Office of Compliance in 1991 to the same pay

grade and job title as she held before her detail to HID in 1986; (14) unlawfully detailed to HID for

over three years; (15) denied a position description during her HID detail; (16) subjected to

management's falsification of her reassignment papers to the Office of Compliance; (17) subjected

to those falsified papers being signed by the Director of the Department; (18) denied a career ladder

promotion to dispute resolution specialist; (19) denied the promotion despite outstanding

performance evaluations; (20) subjected to the breach of her 1985 Consent Decree; (21) stripped of

her right to flex time in 1997; (22) falsely accused of reporting leave abuses; (23) labeled a

complainer by management; (24) refused settlement of her career-ladder complaint in 1998 and

1999, even thought the Department settled with all other employees with similar complaints; (25)

assigned to duties without the corresponding pay grade increase; (26) harassed by HID and RHC

managers and employees at the encouragement of the Department management; (27) reduced from

Outstanding to Satisfactory as her lawsuit neared settlement; and (28) detailed to a clerical position

at the front of the office while detailed in HID. Pls.' Opp'n at 27–29; Def.'s Mot. at 11–12. As

with Glenn, Dickens states that the above conduct resulted in an "unlawful employment practice"

and that the Department knew of and condoned the conduct. Pls.' Opp'n at 30. As with Glenn,

Dickens also alleges that she suffered retaliatory hostile work environment in addition to discriminatory hostile work environment. *Id.* at 26.

In order for Dickens to prevail on her discriminatory hostile work environment claim, she has to prove that the "allegations give rise to an inference of discrimination by defendant based on" sex. *Bryant*, 265 F. Supp. 2d at 63. Defendant's primary argument is that Dickens has failed to do this; instead, the above allegations are at most alleged to be in retaliation for Dickens' engagement in protected activity. Def.'s Mot. at 13. Only Act (4), (7), (18), and (19) relate in any way to sex discrimination. *See* Pls.' Opp'n at 27–28 (providing the paragraphs of Dickens affidavit on which the allegations are based). In order to have an actionable claim of discriminatory hostile work environment, at least one of the acts must have occurred during the filing period. Each of these four acts occurred before Dickens was assigned to the Office of Compliance in 1991, and are therefore well outside the filing period. Dickens' claim of discriminatory hostile work environment must therefore fail.

The bulk of the remaining claims are relevant to Dickens retaliatory hostile work environment claim. In her affidavit, Dickens asserts that Acts (7) and (28), being made to sit in the front of the office and perform clerical duties, were in retaliation for complaining that she had been denied leave while she was detailed at the HID to the Assessment, Court, and Variance Branch. Dickens Aff. ¶ 19. Acts (6) and (9) were allegedly in retaliation for Dickens' filing of the 1991 Title VII class action lawsuit. *Id.* at ¶ 22. Acts (3), (13), (16), and (17), which related to Dickens assignment to the Office of Compliance in 1991, was allegedly also done in retaliation for Dickens 1991 Title VII class action lawsuit. *Id.* ¶ 26. Acts (24) and (27) allegedly occurred in retaliation for Dickens' complaint for not being promoted in 1994. *Id.* at ¶¶ 29, 42, 46. In her deposition, Dickens asserts that the removal of her flex time privileges in 1997, Act (21), was an act of

retaliation.  Pls.' Opp'n Ex. 6 (Dickens Dep.), at 121:21–22.  Dickens also asserts that Act (23),

being labeled a complainer in 1997, was also done in retaliation.  *Id*. at 122:19.  The support

Dickens provides for Act (1), that she was written up for minor infractions at the RHC, indicates that

the act was retaliatory as it occurred between 1984, when Dickens was reinstated with the

Department, through 1986.  Pls.' Opp'n Ex. 16 (Hooks-Scott Dep.), at 77–78.  Acts (14) and (15),

which relate to Dickens' 1987 detail to HID, were allegedly done in retaliation for the complaints

Dickens had made regarding the retaliation and harassment she experienced while at RHC.  Pls.'

Opp'n at 7; Dickens Aff. ¶ 11.

Only two of the above acts could conceivably fall within the filing period.  As Plaintiffs did

not provide the Court with the original EEOC complaint, and as there is no evidence indicating

whether Plaintiffs first filed with the D.C. agency capable of handling such matters or whether

Plaintiffs filed directly with the EEOC, and because Defendant did not make this issue a matter of

contention, the Court will assume the former, therefore the statutory filing period would be 300

days.  Consequently, the acts would have had to occur after March 27, 1997.  However, Dickens

does not provide any evidence as to the dates on which these acts occurred, so in construing facts in

the light most favorable to the non-moving party, the Court will presume that the acts occurred after

March 27, 1997.  With that said, neither being labeled a complainer by management nor having her

flex-time stripped will support a finding of retaliatory hostile work environment.  First, Dickens

claims she was labeled a complainer.  In her deposition, Dickens states that sometime in 1997 a

manager, Franklin Moody, who later related the tale to Dickens, indicated to a second manager,

Ruth Banks, that Dickens would be a good person to add to her personnel team as she is a good

writer.  Pls.' Opp'n Ex. 6, Dickens Dep. 122:15, 19–22, 123:1.  Banks agreed, but said that

Dickens "was always complaining."  *Id*. at 123:1–4.  However, at the time this comment was made,

Dickens *was* filing a variety of complaints, by her own admission. *Id.* at 123:14–19, 124:5–9.

Second, Dickens claims she was stripped of her flex time in 1997. This allegation is too innocuous to be actionable. Where a personnel decision, such as this, is so mild and common, it cannot form the basis of a Title VII hostile work environment claim. *See Bryant*, 265 F. Supp. 2d at 69. Consequently, as neither act occurring within the filing period is actionable, Dickens' claim of retaliatory hostile work environment must fail. "Although plaintiff may have subjectively felt harassed by defendant, the evidence does not substantiate the presence of 'extreme' conduct that 'amount[s] to a change in the terms and conditions of employment.'" *Id.* at 70 (quoting *Faragher*, 524 U.S. at 788, 122 S. Ct. at 2284)). Defendant's Motion for Summary Judgment as to Dickens' hostile work environment claims is granted.

D. *Constructive Discharge (Count V)*

Plaintiffs final claims are for constructive discharge. In order to establish a claim of constructive discharge Plaintiffs must prove "(1) intentional discrimination existed, (2) the employer deliberately made working conditions intolerable, and (3) aggravating factors justified the [Plaintiffs'] conclusion that [they] had no option but to end [their] employment." *Sisay v. Greyhound Lines Inc.*, 34 F. Supp. 2d 59, 66 (D.D.C. 1998). To find constructive discharge, "the court must decide whether or not the working conditions in the plaintiff's workplace rose to a level of intolerableness that would have driven a *reasonable* person to resign." *Id.* at 65. The standard is therefore an objective one. However, "[i]t does not occur when an employee leaves an unpleasant but objectively tolerable job because alternatives have become more attractive, even if the employer's misbehavior causes the unpleasantness." *Taylor v. FDIC*, 132 F.3d at 766.

Here, Plaintiffs have failed to meet the first element of the *prima facie* case: they have not proven intentional discrimination existed. This Court, as did the court in *Mungin* and *Bryant*, has rejected all of the Plaintiffs' discrimination claims. *See Mungin*, 116 F. 3d at 1558; *Bryant*, 265 F. Supp. 2d at 70 n.13. Accordingly, the Court is "left without any discriminatory acts upon which [Plaintiffs] could rest [their] constructive discharge claim[s]." *Mungin*, 116 F.3d at 1158. Due to the findings of this court on the preceding claims, Plaintiffs "cannot show the type of 'intolerable' working conditions necessary to sustain a constructive discharge claims." *Bryant*, 265 F. Supp. 2d at 70 n.13. Therefore, Defendant's Summary Judgment Motion is granted as to Count V of the Second Amended Complaint.

## IV: CONCLUSION

For the reasons set forth above, Defendant's Motion for Summary Judgment is granted on all counts. An Order accompanies this Memorandum Opinion.

Date:   February 21, 2006

_____/s/_____
COLLEEN KOLLAR-KOTELLY
United States District Judge